67 So.2d 407 (1953)
FLORIDA POWER & LIGHT CO.
v.
BRINSON.
Supreme Court of Florida, Division B.
September 18, 1953.
Rehearing Denied October 20, 1953.
Blackwell, Walker & Gray and S.J. Powers, Jr., Miami, for appellant.
*408 Nichols, Gaither, Green, Frates & Beckham, William Clinton Green and J.B. Spence, Miami, for appellee.
DREW, Justice.
Florida Power & Light Company, appellant (we shall refer to it hereafter as the defendant), owns and operates a high tension electric transmission line along U.S. Highway No. 1 between Fort Pierce and Stuart, Florida. Such line is a part of its operations of manufacturing and distributing electric energy over a large part of Florida. The line in this vicinity carries 66,000 volts.
On November 10, 1945, the defendant entered into a contract with C.P. Rochfort, Troy E. Burrell and Dorothy Jeremiassen, copartners operating under the name of Southeastern Utilities Service Company (we shall refer to such partnership hereafter as the contractor), relating to repairs and maintenance of said line. So far as this litigation is concerned the pertinent parts of said contract are:
(Note: In the following quoted paragraphs of the contract, "contractor" is the partnership known as Southeastern Utilities Service Company and "company" is Florida Power & Light Company, defendant.)
"1. That contractor shall furnish labor, transportation of labor and materials, construction equipment and supervision for constructing substations, electric distribution and transmission lines, and such other work pertaining to the installation of electrical equipment as shall from time to time be arranged for and agreed upon by Contractor and Company in accordance with the terms and conditions of this agreement and with the procedure hereinafter outlined.
"2. That it is contemplated by the parties hereto that Contractor shall perform hereunder from time to time various construction jobs for Company under the terms and conditions of this agreement, and that Company shall furnish to Contractor its regular Purchase Order for said construction jobs. The said Purchase Orders referred to in this section shall be signed either by the Purchasing Agent of Company, one of its Vice-Presidents, or any other duly authorized officer of Company, and shall state thereon the work to be performed by Contractor, the terms of payment to be made by Company to Contractor for said work and all other and further information necessary in connection with the performance of the job to be done for Company by Contractor; that every Purchase Order so issued by Company to Contractor shall be subject to all of the terms and conditions of this agreement just as if such terms and conditions were expressly written in such Purchase Order and if Contractor does not reject such Purchase Order by Written notice to Company's Purchasing Agent within three (3) days from the receipt of such Purchase Order, he shall be deemed to have accepted such Purchase Order and all of its terms and conditions including all of the terms and conditions of this agreement.

* * * * * *
"4. That Contractor shall be furnished by Company with approved working drawings, specifications, bills of materials and instructions as to the performance of the work to be performed by them under this agreement and under each Purchase Order where such work or Purchase Order requires the furnishing of such working drawings, specifications, bills of materials and instructions.

* * * * * *
"25. That the term `Company's Representative' as used in this agreement shall be interpreted to mean some person delegated by the Company, either through the medium of a Purchase Order supplementing the work, or by other written notice to Contractor.
"26. That it is distinctly understood and agreed that Contractor is to do and perform the work to be done hereunder in his own way, free and clear of any management, control or supervision by the Company as to the manner, method or details employed by Contractor in the performance *409 of said work, the Company being interested only in the completed job according to this agreement and the applicable specifications, but Company shall have the right to have its representative or other agent inspect said work from time to time in order to ascertain that said work, as it progresses, is being done conformable to said plans and specifications, so that when the same is completed, it will be in accordance with this agreement. It is understood and agreed, however, that such inspection, the presence of such inspector, or any suggestions or objections made by Company's representative or agent shall in no wise constitute or be construed as an exercise of management or supervision over said work, nor shall it be construed as an acceptance of said work or any part thereof, as it progresses, nor shall it limit or affect the right of Company to reject any part or all of said work when completed, in case the same does not conform to said plans and specification, and the general results to be accomplished.

* * * * * *
"28. That the terms of this agreement shall run for a period of one (1) year from the 10th day of November, 1945, and from year to year thereafter unless either party gives to the other five (5) days' written notice of their or its desire to cancel and terminate the same. However, such written notice shall not relieve either party from the performance of any of the obligations of this agreement in regard to the work which has already been completed or which is already in progress." (Emphasis added.)
The contract, from which the above are excerpts, was admitted by all parties to be in full force and effect at all pertinent times during the period of this litigation.
During the late summer of 1949 the transmission lines of the defendant in the area mentioned above were greatly damaged by a hurricane. Pursuant to the contract aforesaid, defendant, on September 6, 1949, issued Purchase Order No. 127418 to the contractor. This document provided:
"This Order is to cover reconstruction and maintenance on storm rehabilitation work in the five districts in the Eastern Division from August 27th 1949 thru December 31st. 1949 or until this Contractor's services are no longer required whichever is earlier. All work to be done according to Florida Power & Light Company specifications and standards under the direction of J.P. Hanley or his appointed Company Representatives, and contract dated November 10, 1945." (Emphasis added).
Emergency repairs were first made to the lines and thereafter permanent repairs and certain alterations and additions were started. The work progressed until well into the following year and certain orders and lists relating to the work were furnished the contractor from time to time by the defendant in accordance with the provisions of the contract of November 10, 1945. Among these lists and orders was one dated 11-28-49. Sheet No. 4 of this list (omitting work not relating to that involved here) was as follows:

 "Preliminary 11-28-49 RHT
Transmission Lines Sheet No. 4
Structure List W.P.B.-FT. PIERCE 66 KV LINE
 Job Additional Guys, Stuart To Ft. Pierce Section
-------------------------------------------------------------------------------------
Pole | Station | Ht. | Head | Angle | Type | Anchors | Wires | Stubs | Remarks
 | | | Span | | | | | |
------|---------|-------|------|-------|------|---------|-------|-------|-------------
 | | * * * | * * | | | | | |
------|---------|-------|------|-------|------|---------|-------|-------|-------------
60D13 | | 55' | | | DA | | | | Anc 56.5' E
------|---------|-------|------|-------|------|---------|-------|-------|-------------
 | | * * * | * * | | | | | | "
-------------------------------------------------------------------------------------

*410 The evidence shows that "60D13" designated a certain pole; "55'" was the height of the pole; "DA" meant double anchor and "Anc 56.5' E" meant that the anchor on the guy was set 56.5' east of the base of the pole.
The evidence is quite clear that, other than the contract and the Purchase Order, this structure list was all that was in writing concerning the work to be performed by the contractor. All other instructions and orders were oral. Mr. Olus R. Combs, superintendent of the contractor at the time of the trial, who was general foreman of the job of repairing and rebuilding the lines between Stuart and Ft. Pierce under the above contract, testified that: "The written orders were on a structure list, telling where the new guys were to be installed. That was about all that was written."
On January 6, 1950, a crew of the contractor, under the foremanship of Connie Lipe, were engaged in the installation of guy wires (guys) on the poles in the subject area. Another crew of the contractor had preceded them along the route and had installed anchors (a device for holding the ground end of the guy permanently in place) at the location which had been theretofore designated by the defendant. At pole 60D13, as shown by the structure list, this anchor was 56.5' east of the pole, and this particular pole was located at a point in the transmission line that marked an angle to the east. On the west side of the pole were two copper wires (guys) of 11/32" diameter running from the upper portion of the pole to an anchor set in the ground a distance of 25' west from the bottom of the pole. These guys were for the purpose of compensating the strain at the top of the pole caused by the angle of the transmission lines to the east. In the trial of the case and in this opinion these and similar wires were and are referred to as "guys."
In Connie Lipe's crew was a groundman named F.P. Brinson (hereafter called plaintiff or Brinson). The duties of a groundman were principally that of a laborer or helper for the linesmen and other technical employees in the crew. In the course of installing the new guy to the east (a wire of 1/2" diameter  considerably larger and stronger than the 11/32" guys to the west), one of the west guys broke, whipped up over the transmission line carrying 66,000 volts, fell across and energized the guy then being installed and which was at that instant being handled by Brinson and Lipe, the foreman. The charge of electricity killed Lipe and passed through Brinson's body, causing a sudden muscular contraction which threw him some 15 feet, and resulted in serious and permanent injuries, which form the basis of this litigation. The trial resulted in a judgment for plaintiff, from which this appeal is prosecuted.
The negligence charged to the defendant in the complaint was that it had made a detailed inspection of the proposed work, had entered into a contract with the contractor to do the work according to the specifications and standards adopted by it under the direction of its (the defendant's) designated representatives, but that, in redesigning the guying of pole 60D13 it was defectively designed so as to overbalance the existing strain; that it (the defendant) failed to adequately inspect the guy wires to the west of said pole; failed to order such old, decayed and defective guy wire to the west replaced before installing the new guy to the east and failed to warn the plaintiff of such peril, as a result of which plaintiff was injured.
The real bone of contention in this litigation is whether the injury to the plaintiff was caused by the negligence of plaintiff and his fellow employees of the contractor in installing the guy, (that is, in pulling the guy too tight against the guys on the west side) or whether such injury was caused by the negligence of the defendant as outlined above. This is the primary and controlling question argued in the briefs.
Before entering into a discussion of this question, we feel it appropriate to say that in cases of this kind where men are engaged in such dangerous work and thereby are constantly only a second from *411 eternity, the highest degree of care  short of being an insurer  is required of those operating the facility. This does not mean that there is a requirement to make the place absolutely safe or that the defendant is an insurer of the safety of the employee but it does mean that it requires the degree of care commensurate with circumstances then existing or which may reasonably be expected to exist. Vanlandingham v. Florida Power & Light Co., 1944, 154 Fla. 628, 18 So.2d 678. We held that whether a pole on which a linesman was injured was improperly rigged, was a question for the jury, and that if such was the case it constituted actionable negligence. Florida Light & Power Co. v. Hargrove, 160 Fla. 405, 35 So.2d 1. Again, as long ago as 1911, in the case of Escambia County Electric Light & Power Co. v. Sutherland, 61 Fla. 167, 55 So. 83, 91, we declared, under circumstances similar to those here existing, that the defendant was "under obligation to do all that human care, vigilance, and foresight can reasonably do, consistent with the practical operation of its plant to protect [such persons]."
And so it is, if defendant ordered the installation of the east guy and nothing else at pole 60D13 and such guy was installed in a prudent manner and according to established and accepted custom and in doing so the west guy nevertheless broke because of the failure of the defendant to properly inspect or because of a faulty design, defendant would be guilty of actionable negligence.
The record shows that the anchor and the guys on the west side of the pole were old, defective, rusted and generally in bad shape. But defendant says that, while there were no written orders to replace these guys at the time the new east guy was to be installed, an oral order had been given to the contractor long before the accident that such guys were to be replaced at the time the new guy was installed. Much of the record is consumed by the defendant in attempting to prove, and by the plaintiff in attempting to disprove, this point. Concededly, it is the hub of the law suit. We have carefully gone over the voluminous record, depositions and exhibits in search of the answer. Our search, as it should be, has been directed to the proposition of ascertaining if in the record there was competent credible evidence or reasonable inference to be drawn therefrom to support the finding of the jury that no such verbal order was given prior to the time of the unfortunate occurrence which resulted in the serious injuries shown in the record. We are impelled to the conclusion that there is such evidence in the record. True, in this case, as in most cases, there are conflicts, inconsistencies and inaccuracies on both sides, but juries are the means provided to sift such conflicting evidence, separate the wheat from the chaff and come up with the correct answer. There have been many ways devised since the dawn of civilization to sift out the truth from conflicting evidence but we think none any better than the jury system. We, therefore, hold that the jury was justified under the evidence in determining that the plaintiff's injuries were the direct result of the negligence of the defendant as alleged in the complaint.
Moreover, there is evidence in the record on which the jury could have concluded that, regardless of whether the order to change the old guys was ever given, the design of the new guying was an engineering error because of the greatly disproportionate stress on the east side due to the angle of the transmission line at that point and the greater angle between the guy and the pole on the east side as compared to the west side. The assignments of error with reference to the admission of evidence on this question have been carefully examined and found to be without merit.
During the course of the trial in this cause plaintiff vigorously insisted that no order, oral or otherwise, had ever been given to the contractor by the defendant to replace the west guys before the accident. The defendant just as vigorously insisted that such order had been given before the *412 accident and that actually the old guys, both north and south of pole 60D13, had been replaced by the contractor and that such was evidence of the fact such orders had been so issued. Plaintiff then countered with evidence (allowed by the lower court) showing that after the accident a crew of the contractor went back along the line covering the ground already covered by the other crew and then replaced the old guys.
Defendant strongly argues that the allowance of such evidence is clearly erroneous under the rule that no act such as repairs, replacements, etc., done after the occurrence of an injury is receivable as evidence of consciousness or negligence, connivance or culpability in causing an injury. 1 Wigmore on Evidence, 2d Ed., page 582, quoted in Seaboard Air Line Ry. Co. v. Parks, 89 Fla. 405, 104 So. 587. See also Terre Haute & Indianapolis R. Co. v. Clem, 123 Ind. 15, 23 N.E. 965, 7 L.R.A. 588, 18 Am.St.Rep. 303, where the reason for the rule is well defined.
On the other hand, plaintiff says that the evidence was properly admitted because its purpose was to contradict the evidence as to the time the orders were given and not for the purpose of establishing a consciousness of guilt on the part of the defendant.
The foreman of the crew of which Brinson was a member  the person who would have received such orders  was killed in the same tragic occurrence. His lips were sealed in death, hence, in search for the truth, secondary sources had to be explored, so the lower court, in allowing such testimony, observed:
"The case is hurt because Lipe is not able to testify what orders he got. That adds to the difficulty of the matter. That seems to me requires whatever is available from which inference either way as to the existence or nonexistence of the orders and when they were issued, and seems to me overrides any other aspects which are objectionable and undesirable features of the evidence."
We hold that under the circumstances shown the lower court did not abuse its discretion in admitting such evidence for such purposes. Wigmore, Vol. II, 3d Ed., 158, par. 283; Jones on Evidence in Civil Cases, Vol. 1, 4th Ed. par. 138; 65 C.J.S., Negligence, § 224, page 1042. Also see Brannen v. State, 94 Fla. 656, 114 So. 429; Crockett v. State, 137 Fla. 450, 188 So. 214. Moreover, as we have held that there is evidence in the record on which the jury could have found that the injuries were caused by a faulty engineering design of the new guying of said pole, if there was error in the admission of such evidence, it was harmless and did not result in miscarriage of justice. Section 54.23, F.S.A.
Appellant also contends the verdict of the jury in the sum of $60,000 is so grossly excessive as to demonstrate that it was the result of passion, prejudice, bias or sympathy on the part of the jury.
In the light of the above contention we have examined the evidence pertinent to this question. The plaintiff was 46 years of age, always in excellent health prior to the accident and was earning at the time $50 per week. He was married and had 8 children. There is evidence in the record on which the jury could have determined, as testified to by one of the doctors, that the plaintiff "is little better than a vegetable condition. In many respects, he might have been better off if he had died as a result of the electrical shock, because he is of little value to himself or anyone else," or, as testified to by another: "You might say he has become an automaton, that he is quite incapable of doing work or making a living, or even caring for himself. Nothing can be done to restore this individual." There is other testimony that his disability to work or his occupational handicap was 100%. Under such testimony the jury's verdict does not shock the judicial conscience of this Court and we find nothing in the record which would justify interfering with it. Florida Motor Lines Corp. v. Barry, 158 Fla. 123, 27 So.2d 753; Breeding's Dania Drug Co. v. Runyon, 147 Fla. 123, 2 So.2d 376, and cases cited.
*413 We have examined the other questions argued and the assignments of error upon which they rest. In none do we find a reason for upsetting the judgment appealed from.
Affirmed.
ROBERTS, C.J., and THOMAS and HOBSON, JJ., concur.