68 So.2d 406 (1953)
FLORIDA POWER & LIGHT CO.
v.
ROBINSON.
Supreme Court of Florida. Division A.
November 17, 1953.
Rehearing Denied December 9, 1953.
*408 Blackwell, Walker & Gray, Miami, for appellant.
Nichols, Gaither, Green, Frates & Beckham, and Murray Sams, Jr., Miami for appellee.
SEBRING, Justice.
Calvin J. Robinson sued Florida Power & Light Company, hereinafter referred to as the Power Company, to recover damages for personal injuries received when he jumped from a pole upon which he was working as a lineman. Before the case came on for trial the plaintiff was adjudged to be mentally and physically incompetent, and his wife was appointed as guardian of his person and property. Thereafter, the guardian was substituted as party plaintiff in the case and the cause proceeded to trial. At the conclusion of the trial the jury returned a verdict in favor of the plaintiff, the court denied a motion for new trial filed by the defendant, judgment was rendered in favor of the plaintiff, and the defendant appealed.
The dominant question on the appeal is whether under the evidence which the jury had a right to believe a verdict in favor of the plaintiff was warranted.
According to the evidence, Florida Power & Light Company, in the fall of 1949, made an inspection of its power lines, particularly its 66,000 volt high transmission line between Okeechobee and Arcadia, Florida, for the purpose of determining which poles and equipment were defective and required replacement. This inspection was conducted in two separate phases by two separate inspection crews. In the first inspection the members of the inspection crew were supplied with screwdrivers and hammers, and the inspection of the poles was confined to what is known as a climbing test. In such a test, the inspector strikes the pole sharply with his hammer and then listens with his ear against the pole to ascertain whether or not the blow produces in the pole a ringing sound. By this test, a pole that is free from rot above ground emits a very definite sound which indicates to an experienced inspector that the pole is in good condition. If this test discloses that the pole is not rotten above ground, one of the inspectors climbs the pole to check for rot and defects along the sides, at the upper end, or on the top. The first phase of the inspection is completed by the inspector pushing or driving his screwdriver into the pole at and above ground level to check for crust or shell. From the findings thus obtained the inspection crew classifies the poles either as "good," "fair," or "bad," and the findings are recorded on a "transmission line survey form" furnished each crew for that purpose.
After the first inspection has been completed, a second test is made of such poles as are classified by the first inspection crew as "fair" or "bad." The second inspection is much more comprehensive than the first, and is made with tools especially designed to discover rot and other defects both above and below ground. Among these tools is an "increment borer," an instrument specifically designed to extract a core of wood from the center of the pole. By the use of this instrument the presence of rot in the *409 pole can be detected no matter how deep it may be from the outer surface. The second inspection crew is also provided with a long steel rod for checking underground rot  a condition that cannot be ascertained through means of the climbing test made with screwdriver and hammer. As the result of the second-phase inspection made with more adequate tools, poles that may have been classified by the first inspection crew as "fair" are frequently reclassified by the second inspection crew as "bad," and vice versa.
According to the evidence, a pole may be classified as "bad," without further description or elaboration, for any one of a number of reasons. For example, a pole will be classified as "bad" because of the existence of rot underground, in the middle portion, or at the top; it will be classified as "bad" because of splits, or seams, or woodpecker holes in the top or down the sides. Some of the conditions rendering a pole "bad" can be readily seen; others may be readily discovered by the use of the simple climbing test; but underground rot or decay cannot ordinarily be determined except by the use of instruments specifically designed for the purpose.
After the Power Company had completed the inspection of its lines, in 1949, it entered into a contract with the Southeastern Utilities Service Company, an independent contractor, whereby the latter agreed to remove and replace all poles that the Power Company had determined by its inspection were "bad." The plaintiff, Calvin J. Robinson, was employed by the independent contractor as a lineman for such work.
On May 11, 1950, in the course of this work, the line crew of which Robinson was a member had completed changing out or transferring two of the "bad" poles along the line. They went next to a pole designated by the Power Company as Pole 35-L-7, which also was to be removed and replaced because it was "bad." As had been the practice throughout the operation, a crew preceding the crew of which Robinson was a member had already set a new pole in place three feet from Pole 35-L-7, directly in line, and ready for the changeover or transfer of the 66,000 volt transmission line conductors, crossarms, and guy wires from the old pole to the new one.
The plaintiff, Robinson, and his "polebuddy," one Smith, were assigned the job of climbing the old pole and making the necessary change-over. As was the invariable and unfailing custom and practice among linemen employed in such hazardous work, Robinson and Smith, before going up Pole 35-L-7, made a personal inspection to determine whether or not the pole was safe to climb. Smith drove a screwdriver into the base of the pole, at or about ground level, and then struck the pole with a hammer to sound it for decay. Robinson noticed a screwdriver hole in the pole at ground level; that several inches of dirt appeared to have been dug away from the butt, and that the pole had apparently been probed with some kind of instrument on a prior inspection. Hale, the foreman of the crew, also examined the base of the pole, walked completely around it, and kicked it with the hard heel of his heavy boot.
This was the routine and standard "climbing test" made by all linemen and foremen in a climbing crew to satisfy themselves as to the condition of a pole and that it is safe for climbing. When such an inspection reveals a rotted condition at the base, or when the crew has been warned beforehand that a particular pole is rotten at or below ground level, special precautions are taken before climbing, consisting either of piking the pole with steel rods, putting additional guy lines on the pole, or placing a sling around the old pole and the new pole that is to replace it.
In the instant case the linemen satisfied themselves from the routine climbing test that Pole 35-L-7 was sound and free from rot. Not having been warned to the contrary, they then climbed the pole without first bracing it with pike poles, guy ropes or slings, as they would have done had they had any notice or knowledge that the pole was not in a safe condition.
Once up the pole, Robinson and Smith began the process of dismantling and stripping *410 the pole of its existing supports. First they removed the three heavy conductors for the 66,000 voltage transmission lines and passed them over to Prescott and Pent, two linemen who were on the new pole ready to receive them. Next they removed the crossarms on the pole and lowered them to the ground. This left remaining on the pole only a small crossarm with a telephone wire suspended therefrom, and two supporting guy wires. One of these guys was a down guy which angled from the pole to an anchor secured in the ground to the north; the other was a span guy which ran from the pole in a horizontal direction and was secured to a stub pole to the south, the stub pole, in turn, being guyed to the ground with a down guy.
After the transmission lines had been changed over to the new pole and the crossarms had been lowered to the ground, Smith climbed down below Robinson and cut the down guy from the pole. Within three to ten minutes after this had been done, the pole snapped off a few inches below ground level and Robinson jumped from the pole in order to keep from coming in contact with the high voltage lines.
The Power Company contends that it is not liable for injuries to the plaintiff under this evidence. It submits that inasmuch as Southeastern Utilities Service Company, the independent contractor, had sole and exclusive dominion and control over its employees and the premises where the work was being done, and over the methods and procedures to be employed in effecting the work, the defendant was under no legal duty to warn the independent contractor, or its employees, that any particular pole that had been classified by it as "bad" was "bad" because it was decayed at or below ground level; that this was a condition which the independent contractor and its employees were charged with the responsibility of determining for themselves, at their own peril. The defendant submits, also, that the plaintiff was guilty of contributory negligence in not ascertaining for himself that the pole was rotten at and below ground level, and in not piking, bracing or guying the pole after making such discovery.
It is plain, under the facts of the case, that the duty of care which the defendant owed the plaintiff, Robinson, depends in the first instance of the relationship of the parties. As has been noted, Robinson was not working for the Power Company, but was employed by the independent contractor.
With respect to the duty owed by the Power Company to an employee of its independent contractor, it has been said that such an employee's "status as to defendant was that of an invitee on defendant's premises while he was performing his duties in serving [the independent contractor] in the fulfillment of the contract. Under such relationship and because of the hazardous work the defendant [Power Company] owed a duty to exercise the highest degree of care possible, commensurate with the business engaged in." Vanlandingham v. Florida Power & Light Co., 154 Fla. 628, 18 So.2d 678, 679. While denying the propriety of the allegation in the declaration "that the defendant was obligated to furnish deceased a safe place to work", on the ground that defendant was not an insurer so as to require it absolutely to furnish a safe place for work, the opinion in the Vanlandingham case clearly affirmed the rule that the law required of the Power Company the exercise of a high degree of care to provide safe working conditions for employees of an independent contractor in work such as was here involved. See also Florida Power & Light Co. v. Brinson, Fla., 67 So.2d 407.
What will constitute a discharge of the duty to exercise a high degree of care will depend upon the circumstances of each case. For example, it is obvious that where the employee is injured as the proximate result of conditions or defects which his employer, the independent contractor, is engaged to correct, liability cannot be predicated on the mere fact alone that those conditions were unsafe. 57 C.J.S., Master & Servant, § 603. However, a person having work done on his premises is not absolved of all duty to workmen simply because they happen to be employed by the *411 independent contractor to whom the work is entrusted. "A person who is having work done on his premises by an independent contractor, and has actual or constructive knowledge of latent or potential dangers on the premises, owes a duty to give warning of, or use ordinary care to furnish protection against, such dangers to employees of the contractor and subcontractor who are without actual or constructive notice of the dangers." 57 C.J.S., Master & Servant, § 606; Brown v. Board of Trustees of Leland Stanford Junior University, 41 Cal. App. 100, 182 P. 316; Gallo v. Leahy, 297 Mass. 265, 8 N.E.2d 782; Debenjak v. Parkway Oil Co., 159 Pa.Super. 603, 49 A.2d 521; Calvert v. Springfield Electric Light Co., 231 Ill. 290, 83 N.E. 184, 14 L.R.A.,N.S., 782; Samuelson v. Cleveland Iron Mining Co., 49 Mich. 164, 13 N.W. 499.
In the light of this established rule the inquiries in the present case should be: Did the Power Company have actual or constructive knowledge of the defect which caused the injury? Did the defect constitute a latent danger? Did the plaintiff have actual or constructive notice of the danger?
The only logical conclusion that can be drawn from the testimony concerning the nature and extent of the detailed survey of its lines made by the Power Company prior to contracting for the replacement work, and concerning the physical evidence that an inspection for underground rot had been made on the pole in question, is that the defendant knew  or what is the equivalent in law, was on notice by reason of a detailed inspection made with tools especially designed for the purpose  of the true condition of Pole 35-L-7. In bringing in a verdict for the plaintiff, such must have been the jury's conclusion. And there is ample evidence in the record to support the finding. The first question posed on this appeal, therefore, must be answered in favor of the plaintiff.
In view of the conflicting evidence as to what tests would have been required to reveal the existence of the defect which caused the pole to break, we are obligated to find that the issue was one to be resolved by the jury. There was substantial competent evidence from which the jury could have concluded that the exterior of Pole 35-L-7 was sound to a point below ground level, even though, as the physical evidence reflects, rot in the interior extended up into the pole in cone form. There was also ample evidence, which the jury had the right to believe, that the usual "climbing test" was performed with screwdriver and hammer and revealed no evidence of decay in the pole immediately at or above ground level; and that an ordinary prudent lineman in the shoes of the plaintiff would not have discovered the defect. Upon these facts, it must be concluded that the existent defect constituted a latent danger. And the mere fact that Pole 35-L-7 was designated on the worksheet furnished the independent contractor and passed on to the foreman of the crew as "bad," cannot be held to have imported notice of concealed defects which the linemen could not have discovered by the exercise of ordinary care, when that designation was used for all poles to be replaced by the independent contractor for any of a number and variety of reasons.
The case of Storm v. New York Telephone Co., 270 N.Y. 103, 200 N.E. 659, 661, is an excellent illustration of the application of the rule as to the duty of the owner of property to warn of danger. In the case it appears that the defendant telephone company had determined by a survey or inspection that certain of its poles should be replaced because of dry rot and decay at the butts. After transferring its own lines to new poles, it had notified a lessee lighting company to remove its equipment. An employee of the latter company was injured when a pole upon which he was working broke and fell to the ground. The telephone company was held to have fulfilled its "duty * * * to use reasonable care to give warning" upon a showing that it had notified plaintiff's foreman "to be sure to pike or rope the poles * * * because we know and you know that those poles are not sound. They are old and deteriorated."
*412 Neither the case at bar nor Storm v. New York Telephone Co., supra, is concerned with the issue whether a utility company has the affirmative duty to make continuing inspections of poles and lines to ensure their safe condition before sending linemen out for ordinary repair, maintenance and construction work. See annotation, 21 L.R.A.,N.S., 774; and Peninsular Telephone Co. v. Dority, 128 Fla. 106, 174 So. 446.
Nor are we concerned, on the facts of this case, with the question of what might have been the liability of the Power Company had it made no preliminary inspection of the poles to be replaced. Compare Adams v. Central Indiana R. Co., 38 Ind. App. 607, 78 N.E. 687. For, having made a detailed inspection of its poles shortly prior to the accident for the purpose of determining their condition, the Power Company had actual knowledge, or at least reasonable opportunity for knowledge, of the concealed defect in Pole 35-L-7; and there is, therefore, no need to rest liability upon notice imputed by law when there is a duty, though unfulfilled, to discover danger. The instant case is also to be distinguished from one in which the lineman fails in the first instance to make such examination of the premises as should be made by any prudent man in his occupation. Compare Sias v. Consolidated Lighting Co., 73 Vt. 35, 50 A. 554; Campbell v. Rockland Trust Co., 311 Mass. 663, 42 N.E.2d 586.
Though the rule has been acknowledged in this jurisdiction, to the effect that "an experienced lineman assumes the risk of the breaking of any pole he is called on to climb * * * if the defect * * * was not of original construction," it is plain that the qualification has at the same time been made that such a rule is not applicable when "the defect which caused the pole to break was latent and undiscoverable by any reasonable precaution." City of Sebring v. Avant, 95 Fla. 960, 117 So. 383, 384.
It is uncontroverted that neither the plaintiff nor his employer, the independent contractor, had actual notice of the fact that the pole was rotted at the base. The work sheets furnished to the contractor simply designated all poles to be replaced as "bad," whatever the reason for replacement. The fact that before climbing the pole the plaintiff observed evidence of a previous examination of the pole at the base did not, by any means, put him on notice that the results of the test showed rot, or that because a test had been made the pole should be piked or braced for climbing.
As has been previously suggested, the rule requiring warning of danger does not require warning as to any dangers, latent or otherwise, arising in the course of the work being done, where the work itself makes the place and creates the danger  compare Mullin v. Genesee County Electric Light, Power & Gas Co., 202 N.Y. 275, 95 N.E. 689; nor is the requirement present where the lineman is put on notice of possible danger by the apparently decayed or otherwise unsound condition of the pole and thus has forewarning that it probably will not be strong enough to support a man working on it. In such a situation due care for his own safety may require of a lineman more than ordinary precautions, even if the usual "climbing test" reveals no obvious danger. McIsaac v. Northhampton Electric Lighting Co., 172 Mass. 89, 51 N.E. 524.
As we view the evidence submitted at the trial, the jury had the right to conclude that the Power Company knew or should have known from its prior inspections with the increment borers and other special instruments furnished its crew that Pole 35-L-7 was rotten underground and that underground rot in a power pole presented a situation of danger; that it knew the employees of the independent contractor had no means of discovering underground rot with the simple tools and procedures used by them for the purpose of discovering the soundness of poles to be climbed; that it knew the linemen of the independent contractor would be required to climb Pole 35-L-7 in order to perform the work which the independent contractor had agreed to do; that it knew the linemen, in accordance with custom, were not guying or piking poles which they did not know, or could not discover by the use of ordinary care, with *413 the tools at hand, were rotten, or might be rotten at or below ground level. Having knowledge of these facts prior to the happening of the accident, the Power Company negligently failed to notify the independent contractor of the condition of Pole 35-L-7 but merely gave information that the pole was "bad"  the classification given all poles to be removed for any one of divers and sundry defects, some of which were discoverable by the simple "climbing test," and some of which, including the one that caused the injury, were not. Consequently, we hold that a verdict in favor of the plaintiff was not unwarranted.
The contention is made by the Power Company that the plaintiff was guilty of contributory negligence and ought to be barred from recovery. We think that what has been said above disposes of this issue in favor of the plaintiff, and consequently we reject the contention.
Other questions argued on this appeal go to the propriety of the trial judge's refusal to grant the jury's request to have the deposition of plaintiff Robinson re-read to them during their deliberations; the propriety of the court's permitting Robinson to testify at the trial without a qualifying examination, when he had prior thereto been declared incompetent and was prosecuting his action by guardian; the sufficiency of the instructions on contributory negligence; the propriety of admitting the deposition of the court-appointed physician, allegedly taken by plaintiff without sufficient notice to counsel for defendant; and the sufficiency of the evidence to support the amount of the verdict.
As to the first point, the granting or denying of a request by the jury to have certain portions of the testimony read to them or evidence brought before them during their deliberations is purely within the discretion of the court, and the appellant's contentions in this respect are controlled by the principle that such rulings will not be interfered with unless abuse of discretion is shown. Routh v. Williams, 141 Fla. 334, 193 So. 71; annotation, 21 L.R.A.,N.S., 931.
The governing rule in respect to the second point argued is that "while a recent adjudication of insanity creates a rebuttable presumption of * * * continued insanity, notwithstanding such adjudication a person is competent as a witness where it is shown that he had a lucid interval, has sufficient understanding to comprehend the nature and obligation of an oath, and that his mental capacity is such that he can understand and intelligently answer questions propounded to him." 58 Am.Jur., Witnesses, § 121. And "competency may be ascertained by an examination of witnesses acquainted with him, or by a personal examination of him * * * at the discretion of the court." Id. sec. 124.
In this regard, the record in the case reflects that prior to the time Robinson was called as a witness there was abundant medical testimony in respect to his mental and physical condition and his progress to date of trial, and testimony of other persons who knew him. The order of the court below on this issue could have been based, under the above rule, on evidence already before the court, without the necessity for further examination of the witness personally to determine his competency. Moreover, assuming, for the purpose of argument only, that the judge did commit error in refusing to permit the examination of Robinson, his action cannot be said to have constituted reversible or prejudicial error, in view of the clear and coherent manner in which Robinson's testimony was given, and his evident capacity as a witness. State v. Palmer, 206 Minn. 185, 288 N.W. 160.
Insofar as error is claimed in the instructions pertaining to the defense of contributory negligence, no substantial question is raised. A brief but explicit charge on the subject was given. Repetition is not required, as it serves only to give undue emphasis. Lithgow Funeral Centers v. Loftin, Fla., 60 So.2d 745.
The deposition, the admission of which is claimed to be erroneous, is in accord with and corroborative of other *414 medical evidence in the cause. In view of that fact, and the further circumstance that the imminent departure of the witness to be questioned constituted good cause for the movant to change the time for taking his deposition, it cannot be said that the service of the written motion on the same date as the day the deposition was to be taken placed any impossible burden on the appellant.
The final question presented relates to the amount of the verdict. The appellant maintains that the judgment in the sum of $225,360 is so grossly excessive as to demonstrate that it was the result of passion, prejudice, sympathy, or other extraneous factor and not the result of a fair and rational consideration of the substantial evidence in the cause.
While it is true that the award was a large one, it does not necessarily follow by reason of that fact alone that it was excessive, within the contemplation of the law, or that the jury was motivated by improper consideration in returning it. Margaret Ann Super Markets, Inc., v. Scholl, 159 Fla. 748, 34 So.2d 238.
The uncontroverted medical evidence in the record is that Robinson suffered a compression fracture of the first lumbar vertebra with displacement of the vertebra backward into the spinal canal; a fracture of the tibia and fibula of the right leg with a comminution of the fragments; a brain concussion, and other contusions. He was hospitalized for 7 months; was in a state of acute shock for a considerable length of time; spent many weeks on a special arched bed frame; wore a body cast for almost 3 months, a leg cast for 6 months, and braces thereafter; had to undergo a bone graft operation on his leg because the fracture would not heal; and has been forced to wear an indwelling catheter, a penile clamp, or some other apparatus for artificial control of urination at all times since his injury.
The permanent disabilities resulting from his injuries are manifold. The doctors testified that due to the interruption of nerve supply in the injured spine, Robinson has virtually no control of either his bladder or bowel activities; is unable to perform any sexual functions, being incapable of having an erection or sexual intercourse; has suffered marked atrophy of the propulsion muscles in his buttocks and the whole right lower extremity, severe loss of position sense in the right foot, and loss of muscle strength in the left leg, necessitating support in walking and causing staggering and a steppage gait from the dropped right foot which he is unable to pull up. The uniform medical opinion is that he has probably reached, already, about the maximum recovery in each of these respects.
Dr. Armour, the court appointed physician, testified that his neurological examination revealed a complete absence of sensation over the inner portions of the buttocks, and over the genital organs as well as in the perineum; that the indications were that the plaintiff suffered a brain concussion which was a cause of his severe headaches and emotional fluctuation.
Dr. Keiser, an orthopedic surgeon and Robinson's treating physician, reported that the displaced vertebra still projects backwards into the spinal canal area, which condition he considered permanent; that continuing pain and discomfort under these circumstances are reasonable complaints; and that the prognostication for his case includes the probable development of traumatic arthritis, a condition which is quite painful and for which there is no known cure. Dr. Keedy, a neurosurgeon, verified the injury to the spinal cord, and the overall tendency to severe depression by reason of the nature of the afflictions. He did not know of any operative procedure or medical treatment that could do anything for such condition, although medical care and consultation would be a continuing psychological necessity for the rest of Robinson's life, along with the constant care of a urologist because of the likelihood of eventual fatal infection from bladder to kidneys.
All agree that Robinson will probably require an attendant as long as he lives; *415 that he will never be able to earn a livelihood for his wife and child; that he is almost totally disabled in a sexual, social and economic sense.
From this, and other evidence that the jury had the right to believe, is shown the picture of a man who prior to the accident was in the prime of life  an outdoor man who was healthy, strong, vigorous and virile. He liked to fish and hunt and to take his family with him on these excursions. Before the accident he enjoyed dancing, playing cards, and otherwise mingling with people socially. He and his wife were compatible sexually. The accident has left the plaintiff totally disabled from an economic point of view and has severely disabled him from a social standpoint. He has no active power of locomotion. He has frequent severe headaches. He is completely impotent. He has no control of his bowels or urine, and as a consequence always has a foul, nauseating stench about him. He no longer has an active and normal family life or any social contacts. As the result of his humiliating injuries the plaintiff has grown seclusive. He has built up a strong sense of frustration. He has become extremely irritable and is subject to fits of deep depression. At times he threatens suicide.
It is urged by the appellant that in the face of this showing the verdict returned in favor of the plaintiff was prompted by improper factors outside the evidence. We are unable to agree with this thesis. The rule is that "the burden is with him who assails the amount of the verdict to show that it is wholly unsupported by the evidence, or that the jury was influenced by passion [or], prejudice", and that the amount of the award is such as to "shock the judicial conscience". Breeding's Dania Drug Co. v. Runyon, 147 Fla. 123, 2 So.2d 376, 377; Florida Power & Light Co. v. Brinson, supra [67 So.2d 407]. "When the verdict rendered is approved by the trial court and has a reasonable relation to the damages proven, it should not be disturbed. * * * We must be shown that it imposes a hardship out of proportion to the injury suffered." Margaret Ann Super Markets, Inc. v. Scholl, supra [159 Fla. 748, 34 So.2d 241].
We hold to the view that the defendant has failed to show reversible error and that consequently the judgment appealed from should be affirmed.
It is so ordered.
ROBERTS, C.J., and TERRELL and MATHEWS, JJ., concur.