129 So.2d 457 (1961)
Rita S. AHEARN, a widow, Appellant,
v.
FLORIDA POWER AND LIGHT COMPANY, a corporation, Appellee.
No. 623.
District Court of Appeal of Florida. Second District.
April 26, 1961.
Rehearing Denied May 18, 1961.
*458 Fowler, White, Gillen, Yancey & Humkey, Tampa, and Berryhill, Leaird & Tedder, Fort Lauderdale, for appellant.
Fleming, O'Bryan & Fleming, Fort Lauderdale, for appellee.
KANNER, Judge.
In an action against the defendant, Florida Power and Light Company, by the plaintiff, Rita S. Ahearn, for wrongful death of her husband by electrocution, the defendant, at the close of plaintiff's case in chief, moved for a directed verdict. The motion was granted by the trial judge and this appeal was brought from the final judgment consequent upon the directed order.
Based upon plaintiff's first appeal point, this court found that "since the directed verdict was not restricted to the evidence of plaintiff's case in chief, the trial judge committed reversible error" and remanded the cause for new trial. On certiorari, the Florida Supreme Court ruled that the decision thus rendered was obviously based upon the assumption that the trial court erroneously considered testimony of the defendant's witnesses taken out of turn and was in conflict with Florida cases supporting the established rule of appellate practice that the judgment of the court below is presumed to be correct and free from error. The Supreme Court quashed the decision and remanded the cause to this court for adjudication of the plaintiff's remaining two points. See Ahearn v. Florida Power & Light Company, Fla.App. 1959, 113 So.2d 751; and Florida Power & Light Company v. Ahearn, Fla. 1960, 118 So.2d 21.
Points two and three of plaintiff's appeal assert that the trial judge erred in directing a verdict for the defendant under the issues of (2) whether the plaintiff made out a prima facie case of negligence against the defendant and (3) whether the plaintiff's deceased husband was guilty of negligence which proximately contributed to cause his own death as a matter of law.
A precis of the basic facts of plaintiff's case will here be given. Ahearn, plaintiff's decedent, was electrocuted when the boom of a crane made contact with high tension wires of the defendant. Arrangements with Ahearn's employer, Hercules Pile Co., for use of a large Manitowac crane and a crew of two men had been made by Sunshine Contractors, Inc., who in turn had been *459 engaged by the power company to construct a culvert under State Road 84 in Broward County, Florida. The construction was in connection with operation of defendant's electric power plant at Dania, to which certain additions and improvements had been made.
The crane was to be used in that project to drive pilings where necessary and, prior to being brought to the culvert site, it had been used at defendant's Dania plant on the same project of which the culvert construction was a part. In that project, Ahearn supervised the entire pile driving operation for the Hercules Company. The crane, prior to the accident, was stored on the power company's property. During work done by Hercules at the Dania plant, wires had been de-energized at times when heavy machinery was being used. Where the power company knew of work being done near its wires, warnings had been issued, stickers posted in cranes and on other heavy equipment, safety men posted at the scene, and wires de-energized or insulated. Each employee of the power company was instructed to watch and warn of danger. During June and early July, a safety inspector was present at the culvert site practically all the time. At the time of the accident, no safety man was on duty, no warning had been given, no safety signs were posted, and the wires across the road had not been insulated nor de-energized. The weather was clear and the wires were visible. Ahearn was a graduate civil engineer and was experienced in pile driving operations. As construction superintendent for Hercules, he had accompanied the crane and its crew to the job site to superintend the operation.
State Road 84 in the area under consideration runs east and west. Electric distribution lines running parallel to the highway and along the south side of it were owned and maintained by the power company. At a point 132 feet east of the site of the proposed culvert and at a height of approximately 30.8 feet, the power company also had high tension wires, uninsulated and carrying 7,600 volts which ran from south to north across that roadway. These wires, after crossing the highway, entered a transformer located on a pole on the north side of the highway, where the voltage was reduced to 220; from there they ran to a small cabinet shop. The purpose of the line crossing the highway was to service the cabinet shop, and the line running from the transformer to that shop was insulated.
Mounted in a vehicle called a lowboy, the crane was transported to the scene from defendant's property, approaching from the east and being unloaded on the north side of State Road 84 just east of defendant's wires. It was then necessary that the crane proceed to the west along the road and pass under defendant's wires in order to reach the job site. It was maneuvered into position, facing west; the boom, 62 feet long and extending fifty feet from the cab of the crane, was lowered into a position almost horizontal with the road and about fifteen feet above it and was stationary. In order that the crane be prepared for its work, it had to be rigged. This process necessitated anchoring the crane's cable to a solid object, then raising the boom into a perpendicular position and fitting it with a brace known as a gantry.
Between the culvert and the high tension wires crossing the highway were certain concrete pilings heavy enough to be used as an anchor. Ahearn and one crew member grasped the hook on the cable, which hung straight down from the end of the boom directly in front of the cab of the crane. By arm motion, Ahearn signalled the crane operator to move the crane forward; then he and the crew member turned and began walking westward toward the culvert and the pilings stacked there, stripping the cable off the reel. Neither man looked back from that time on. No other signals were given. The crane began to move forward, stopped, backed up a bit, then proceeded forward again. At this time, the boom began to rise and continued to rise until it made contact with the wires. *460 Upon contact, both men were killed instantly.
During trial, plaintiff put on twelve witnesses. Of these, three were put on out of turn for the defendant power company. Approximately 185 pages of the total testimony represent that of plaintiff's twelve witnesses during her entire case in chief, while 78 pages represent testimony of the three witnesses put on out of turn for the defendant. There was extensive cross questioning by both sides, and the record contains numerous exhibits, including 24 photographs for the plaintiff and ten for the defendant.
At the close of plaintiff's testimony in chief, upon motion of the defendant, the court directed the jury to return a verdict for the defendant.[1] In arriving at our determination of plaintiff's two appeal questions, we must proceed with awareness of the principles concerning the limits to which a trial judge is confined in directing a verdict and to which we are confined in considering the cause on appeal.
Ordinarily, issues of negligence or contributory negligence comprise questions to be determined by a jury. Saunders v. Kaplan, Fla.App. 1958, 101 So.2d 181. A court, in exercise of its power to direct a verdict, should use caution and should never grant a motion for the same unless under no view which the jury might lawfully take of the evidence favorable to the adverse party could a verdict for that party be sustained. Katz v. Bear, Fla. 1951, 52 So.2d 903; and Cutchins v. Seaboard Air Line Railroad Company, Fla. 1958, 101 So.2d 857. In moving for a directed verdict, the movant admits every conclusion favorable to the adverse party which a jury might freely and reasonably infer from that evidence. Nelson v. Ziegler, Fla. 1956, 89 So.2d 780; Kilgore Seed Company v. Pearce, Fla. 1958, 103 So.2d 112. Where the circumstances are such that fair-minded men may differ as to what answer should be given to a charge of negligence, the matter is one for the jury. Handel v. Rudnick, Fla. 1955, 78 So.2d 709. An appellate court, in considering the correctness of an order directing *461 a verdict for a defendant at the close of plaintiff's evidence, must indulge every reasonable inference from the evidence which is favorable to the plaintiff. Teare v. Local Union No. 295, Fla. 1957, 98 So.2d 79; and Arnold v. Stewart, Fla.App. 1958, 101 So.2d 61.
In considering the two appeal points, we are restricted to the evidence of plaintiff's case. Bearing in mind this evidence as it may be viewed in the light of the trial court's direction of the verdict, we turn now to our consideration of the second appeal question, whether plaintiff established a case of prima facie negligence against the defendant.
The generation and distribution of electrical energy is highly dangerous to life and property. Electricity, the basic commodity of a power company, coursing invisibly through the quiet of uninsulated high tension wires, of itself sounds no warning as to its lethal nature. So it is, those who operate such a facility have the obligation to exercise care and vigilance in proportion to the peril involved.
Certain Florida cases, although factually different from the present case, directly involve the duty of care with which a power company is charged where danger exists for those working in the vicinity of its wires. The principles employed in these cases are applicable here, insofar as they consider the responsibility devolving upon a power company to provide protection from or warning of the danger, commensurate with the risk involved. Characterizing the duty of caution is the premise that while a power company is not required to become an insurer or to provide an absolutely safe place to work, it is under a definite requirement to exercise a high degree of care with reference to its invitees.
From these representative cases, we see that an employee of an independent contractor engaged in performing services pursuant to contract between his employer and a power company is that company's invitee; and this relationship, together with the hazardous work involved, results in a duty by the power company "to exercise the highest degree of care possible, commensurate with the business engaged in." Vanlandingham v. Florida Power & Light Co., 1944, 154 Fla. 628, 18 So.2d 678, 679. Further, the law requires of a power company the exercise of a high degree of care to provide safe working conditions for the employees of an independent contractor. What will constitute a discharge of that duty will depend upon the circumstances. Florida Power & Light Co. v. Robinson, Fla. 1953, 68 So.2d 406. As to injuries sustained by an employee of an independent contractor engaged in performing services for a power company, the power company is said to have been "under obligation to do all that human care, vigilance, and foresight can reasonably do, consistent with the practical operation of its plant * * *." The company's duty is to exercise "the degree of care commensurate with circumstances then existing or which may reasonably be expected to exist." Florida Power & Light Co. v. Brinson, Fla. 1953, 67 So.2d 407, 411. A person who is having work done on his premises by an independent contractor and has actual or constructive knowledge of latent or potential danger on the premises owes a duty to give warning of or furnish protection against such danger to those employees who are without actual or constructive notice of the danger. Florida Power & Light Co. v. Robinson, supra. The propriety of the use of exposed wires depends on their location. Hardware Mut. Cas. Co. v. Tampa Electric Co., Fla. 1952, 60 So.2d 179, 40 A.L.R.2d 1293.
There are cases, both in the Florida jurisdiction and those of other states, which in respects may be differentiated factually from the instant case but which involve situations wherein injuries and death were inflicted through contact by cranes or other types of equipment with the electric wires of power companies. We cite these cases because they are crane cases and because *462 of the principles applied by the respective courts in arriving at their determinations.
A recent Florida case of this nature is that of Bell v. Florida Power & Light Company, Fla.App. 1958, 106 So.2d 224. A verdict directed for the defendants power and telephone companies was reversed by the district court. The Supreme Court issued a writ of certiorari and, after consideration, discharged it. Florida Power & Light Co. v. Bell, Fla. 1959, 113 So.2d 697. The accident involved was the result of contact between defendant power company's energized power line and a crane operated by a construction company engaged in laying underground telephone cables for the defendant telephone company. Plaintiff's decedent, when the accident occurred, was on the ground guiding a load of sheet piling which was being unloaded from a truck. The matter of notice to the defendants that the crane would be used at the accident site was asserted by the plaintiff. Both defendants controverted plaintiff's position as to this and argued the insufficiency of the evidence to establish notice or a promise to de-energize. The defendant power company stated that even if proper notice was given and the promise made, responsibility for the accident must rest on those who knowingly expose themselves to the apparent danger and that the placing of the crane almost immediately beneath the power lines and raising the boom to a higher angle than was required under the circumstances constituted the proximate cause of the accident. The court deemed this position to be tenable, but declared that under plaintiffs' view of the evidence the deceased might be entitled to presume that the wires were de-energized. The evidence on the point was not found to be so conclusive that it would preclude a sustainable verdict for plaintiffs. The district court, in reversing the directed order, concluded that there was sufficient evidence to warrant submission of the cause to the jury. See also Palov v. Florida Power & Light Company, Fla.App. 1958, 107 So.2d 780.
Among the cases of other jurisdictions, embodying a variety of circumstances dealing with liability of power companies for injury or death sustained when cranes made contact with or came in too close proximity to electric wires, are those of Pike v. Consolidated Edison Co. of New York, 1951, 303 N.Y. 1, 99 N.E.2d 885; and Bennett v. New York & Queens Electric Light & Power Co., 1945, 294 N.Y. 334, 62 N.E.2d 219, which are illustrative of the viewpoint of a number of jurisdictions.
In the Pike v. Consolidated Edison Co. case [303 N.Y. 1, 99 N.E.2d 886], plaintiff's decedent, employed as a steel worker by a construction company, was on a truck manually controlling a cable attached to the boom of a nearby crane and was electrocuted when the cable in his hands made contact with the defendant's high tension wires. The court of appeal held that the electric power company maintaining wires 34 feet above the ground knew that a building 19 feet and 11 inches tall was to be erected in the vicinity of the wires and held that the company was not entitled to actual notice of the time when the 80 foot crane would be operating there but was bound to ascertain when it was to be used so as "to protect workmen against the danger that was there hidden in its high tension wires  or so a jury could find * * *." It was pointed out that the electric company, long before the accident, had received for its own use copies of officially approved plans for the construction in progress. The court, stating that under the evidence the use of an 80 foot boom on the occasion in question was not at all extraordinary, held that the company was not unaware of the common use of cranes and booms in the erection of buildings.
In the Bennett case, the court reversed judgment for the defendant. Plaintiff's decedent was electrocuted when, in the course of excavation upon a sewer project, the boom of a crane moved close enough to a high voltage wire of the defendant to produce a short circuit. The boom of the *463 crane was 40 feet long and the high tension wires were located 34 feet from the ground. The court held that a jury question was presented as to whether the decedent met his death by reason of defendant's failure to take those precautions dictated by the danger to which he was exposed, defendant having knowledge of conditions under which the work was being done. Said the court, "We cannot say as a matter of law, as has the Appellate Division, that upon the evidence of record before us the defendant was free from actionable fault. The standard of care required of one maintaining a dangerous agency must be commensurate with the risk therefrom reasonably to be foreseen. In the present case the vigilance required of the defendant depended upon the likelihood of danger to which those near its wires would be exposed by reason of the voltage of electricity which those wires carried. That voltage proved to be a death-bearing current which required of the defendant protective measures which, in existing circumstances, were proportioned to the danger which its transmission created." [294 N.Y. 334, 62 N.E.2d 220]
Other cases involving electrocution or injury through contact with electric wires by cranes or other movable machines and the conflicting decisions reached upon the question of prima facie negligence are dealt with in an extensive annotation in 69 A.L.R. 2d 93.
With these principles before us, we now turn to the facts, from an analysis of which we may determine the issue of prima facie negligence. Testimony reveals that the crane in question had been stored on defendant's property prior to the accident and that defendant, through its representatives, was under contract for the culvert's construction. Witnesses called for plaintiff under the adverse witness rule, Rule 1.37(a), Florida Rules of Civil Procedure, 30 F.S.A., holding positions with defendant had visited the culvert site. Defendant's representatives could see that construction of the culvert might necessitate use of cranes or pile driving rigs. Defendant, through its representatives, had inspected the plans and specifications and had inspected the work.
The company's policy and practice to execute protective measures or to warn of danger where it knew work was being done near its wires was stated by witnesses called by the plaintiff. It was shown that an inspector had been present during the culvert's construction practically all the time during June and July. When the Hercules Company was doing work at the Dania plant of defendant on the same project of which the culvert construction was a part, Ahearn was supervisor of the entire pile driving operation; and the safety measure of de-energizing the wires had been at times employed by the company there, while heavy equipment was being used.
The location of the transformer upon the north side of the roadway required the wires across the highway to bear the full charge of 7,600 volts. Testimony was that the safer procedure would have been to reduce the electricity to 220 volts prior to allowing it to course through the uninsulated line over the road. The site of the transformer, however, reduced the voltage only at the point where the current entered an insulated wire and flowed down to the small cabinet shop.
Thus it appears that defendant had knowledge of the work being done at the culvert site, the need for use of a large crane, and necessity for that crane to pass beneath the high tension wires in order to reach the job site. There is no testimony from plaintiff's case that Ahearn was advised that the line across the road carried the full voltage nor that the company had failed to take the precaution sometimes previously exercised at its Dania plant of de-energizing. No warning was issued through signs placed at the scene or on the crane which had been stored on defendant's property; no safety man was present at time of the accident; and the wires had not been de-energized, nor had they been insulated.
*464 Upon the facts of plaintiff's case, it appears a prima facie case of negligence has been made out by plaintiff in fact and in law, and we so hold.
We next consider plaintiff's third appeal question, whether the decedent was guilty of negligence which proximately contributed to cause his own death as a matter of law. The controversy as to this rests both upon the facts of plaintiff's case and upon an interpretation of those facts.
Defendant asserts that after directing the unloading of the crane, Ahearn immediately set about to rig the gantry, which required anchoring a cable running from the end of the boom and raising the boom almost perpendicular to the ground. Next, defendant states that Ahearn "* * * picked up the cable extending from the end of the boom and began to pull it off the drum, gave certain arm signals to the crane operator, the crane commenced to move forward, the boom commenced to rise, and continued to rise until it came into contact with the clearly visible high tension wires. This was all part of one necessary single operation to rig the crane for use. The only unnecessary and tragic aspect of this operation was the fact that Ahearn caused and allowed the crane to come into contact with the overhead high tension wires." Defendant's brief, page 12.
To support its position, defendant quotes certain testimony of the witness, Stavis, owner of the small cabinet shop adjacent to the scene, to the effect that after grasping the hook, Ahearn gave a signal beckoning the crane forward, that the men were just walking, and that Stavis saw no further signal. Precluded testimony of Sutton given as a witness for the defense is advanced to support statements by the defendant that the uncontradicted testimony shows the crane operator relies solely on signals from the ground man in charge before moving the crane in any manner and that the added pull on the cable occasioned by the boom's rising would cause one holding the cable to be aware that this was being done. Defendant in urging affirmance strongly voiced this precluded testimony in its brief, pages 13-15.[2]
*465 Plaintiff argues that Ahearn at the time of the accident was only moving the crane under the wires, with its boom lowered, so as to reach the culvert and the pilings which were lying well to the west of the wires and that Ahearn neither ordered the boom raised nor was aware of its rising. Plaintiff's facts as to this show that the boom, which at Ahearn's orders had been lowered to a stationary and horizontal position, remained so until after Ahearn had ordered the operator to move the crane forward and had turned his back to occupy himself with the physical task of helping to convey the cable to the culvert. The witness who was watching movement of the crane and who had come from his shop for that purpose saw no further signal and heard no subsequent order. Neither Ahearn nor his companion looked back from the moment they grasped the hook and began walking forward. The crane moved ahead with the boom still horizontal and stationary in accordance with Ahearn's manual instruction until after the operator began making unsignalled movements of the crane and boom. The testimony of the witness, Daley, a worker at the scene, was that after Ahearn had given the signal to move forward, the crane first moved ahead, then backed up, twisted, and moved ahead again for about ten feet before the boom started rising; that neither man looked back, but just walked straight ahead.
Plaintiff further urges that the lack of reaction by Ahearn and his companion to the various unsignalled movements of the crane, including the raising of the boom, indicates that Ahearn was unaware that those movements were being executed. To bear out her assertion, plaintiff quotes testimony of the expert witness, Hennick, who himself had operated Manitowac cranes, to the effect that the cable of a Manitowac crane unwinds from a drum separate from the boom, that the cable is not affected by movements of the boom, and that no added pull on the cable would be produced by the boom's rising. Hennick, a crane operator of 32 years' experience employed by defendant at its Dania and Miami plants, also asserted that a crane operator must accept the responsibility of keeping the boom clear of overhead wires, as well as the ground man.
The trial judge, in his directed order heretofore quoted in full, made his finding, and then more specifically found:
"* * * John T. Ahern (sic) was a graduate engineer, that he was in charge of the crane, responsible for its operation. He was aware of the special danger attendant upon electric wires. The wire was visible. The crane was unloaded, and in its * * * in that immediate area they proceeded to rig it. And, by his causing the crane to be rigged in that area, or failing to prevent if from being rigged in that area, the law says then that he is guilty of negligence which proximately contributed to cause his own injury."
Under this, let us review the skeletal facts and testimony of plaintiff's case. Ahearn was supervisor. The wires across the road were visible. Ahearn was familiar with the danger of electricity. He was a graduate civil engineer. He had been supervising crane operation for defendant prior to that day. Wires at defendant's Dania plant where Ahearn worked were de-energized by defendant at times when heavy machines were being used. Where defendant knows of danger existing as to its wires, it exercises protective or cautionary measures. Defendant knew the culvert was being built and knew that pile driving equipment would be used there. The crane which Ahearn was moving had been stored on and was being brought by Ahearn from defendant's premises. It was necessary that the crane pass beneath defendant's wires in order to reach the culvert. The lowboy approached from the east headed west and the crane which it bore faced east. The step after unloading the huge vehicle and lowering its boom was to *466 maneuver it into position facing west toward the culvert. A distance of 132 feet stretched beyond defendant's wires, or between them and the culvert. The job site was at the culvert. Stacked there were concrete pilings heavy enough to anchor the cable. The steps preliminary to raising the boom and rigging the gantry were movement of the crane to the culvert, then anchoring of the cable. Ahearn, after directing the boom to be placed horizontally and stationary and positioning the crane for movement westward to the culvert, gave the signal for the operator to move forward the crane which had been thus positioned. He was seen to give no further signal. Ahearn evinced no reaction to the unsignalled rising of the boom and unsignalled movements of the crane, but just walked ahead. The crane, after backing up a few feet, had proceeded only thirty feet toward the job site before the accident occurred. The raising of the boom by the operator would have produced no added pull on the cable which Ahearn was helping to carry. The operator, as well as the ground man, must watch out for electrical wires.
A logical view favorable to plaintiff may be deduced from the outlined facts. Under such a view, by Ahearn's orders prior to and during the moving of the crane, the vehicle could have been trundled forward down the road to the culvert with about fifteen feet of clearance between the boom and the overhead wires. The record does not demonstrate that he ever ordered or authorized the boom to be raised. The facts also lend credence to the premise that, as Ahearn moved ahead with his back to the crane, he remained unaware of the operator's unsignalled activity involving the crane and boom. Thus an inference could be made that it was no act nor order of Ahearn which stimulated the operator's raising of the boom, that Ahearn had acted as a reasonably prudent man by the supervisory action taken to effect movement of the crane under the wires to the culvert and, having done so, believed that his order to bring the crane under the wires with boom lowered was being carried out, or was unaware that it was not being carried out. In controverting this, defendant must depend upon its asserted inference that plaintiff's facts lead to an opposite conclusion.
Moreover, under the above stated premise, that Ahearn did act as a reasonably prudent man relative to movement of the crane beneath defendant's wires, the question of whether or not he knew of their lethal nature does not become determinative. In any event, certain facts tend to negate an inference that he was aware of the dangerous amount of electricity flowing through the wires. These include Ahearn's prior experience supervising crane operations for the defendant at its Dania plant, where its practice to exercise care when it knows of danger existing as to its wires was exemplified through de-energizing. Added to this is Ahearn's knowledge that the crane in use at the culvert had been stored on defendant's premises and the fact that, at the culvert, there was no safety man present to protect him and his crew nor any signs to warn them of peril. It might be logically deduced that in view of these circumstances, Ahearn's knowledge of defendant's policy of care would lead him to the conclusion that, had the wires across the road been dangerously charged, the company had taken steps to obviate that danger.
On the other hand, to assume on the basis of the delineated facts that in view of Ahearn's supervisory capacity and qualifications, together with the visibility of the wires, it had been established at the close of plaintiff's case that Ahearn was contributorily negligent by causing or permitting or failing to prevent the accident without any testimony as to what further orders or acts under those circumstances were incumbent upon him and without more evidence that he knew of the wires' lethal voltage, would constitute a debatable conclusion which, under what we have said *467 above, logically is not the only one deducible from the evidence.
The case relied upon strongly by defendant in support of its position as to contributory negligence is that of Dudding v. Florida Keys Electric Co-operative Ass'n, Fla.App. 1958, 105 So.2d 597. In that case, a directed verdict for the power company was sustained on review. A mate on a charter fishing boat, plaintiff raised an aluminum out-rigger on the boat and contacted defendant's high tension wires, with the result that he was badly burned. The boat had just passed under a bridge; and the usual practice was to refrain from raising out-riggers until the boats were well clear of the area, not only because of the wires, but because to do so would be a "calculated risk" of another danger at that particular place. The court found plaintiff to be solely at fault and the injury outside the scope of reasonable foreseeability. The important distinction between that case and the present one is that in the Dudding case, the injured party himself was the one who raised the out-rigger, making contact with the wires, so that there could be no doubt as to whence came the impetus giving rise to his injury. Additionally, the Dudding case did not involve an employee of an independent contractor doing work for the defendant.
Harris v. Florida Public Service Co., 1930, 100 Fla. 90, 129 So. 333, involved an electrocution through contact with defendant's power lines. The Supreme Court declared that ordinarily there is a presumption that due care and caution are observed in particular instances for the reason that the general instinct for self-preservation normally prompts men to so act. This presumption may be rebutted and does not exist where it is incompatible with the duly proven conduct of the person in particular circumstances.
It must be borne in mind that, when a defense of contributory negligence is asserted, being an affirmative defense, the burden thereupon rests upon the defendant to establish it by a preponderance of the evidence.
Upon motion for directed verdict by the defendant at the close of plaintiff's case, the movant admitted every conclusion favorable to the adverse party which a jury might freely and reasonably infer from that evidence. Where the circumstances are such that fair-minded men might differ as to what answer should be given to a charge of negligence, the matter is one for the jury. This court, in considering whether the directed order was correct, must indulge every reasonable inference from the evidence which is favorable to the plaintiff. Under this view, plaintiff's case was sufficient to withstand the defense of contributory negligence upon motion for directed verdict as a matter of law.
When the mandate from the Supreme Court came down remanding the cause to us for consideration of plaintiff's points two and three, this court again heard able oral arguments for the respective parties as to these two points. We have carefully read and probed the entire record. What the result of this case might later be is a matter which would have to flow out of circumstances as they might evolve during new trial, and we here make no comment as to these two issues under such circumstances.
In keeping with the views here expressed, we reverse the judgment and remand the cause to the court below for new trial.
Reversed and remanded.
ALLEN, C.J., and SHANNON, J., concur.
NOTES
[1] "All right. Gentlemen, the Court announces its intentions of directing a verdict for the Defendant upon the prime grounds that John T. Ahern (sic) was guilty of negligence which proximately caused, or contributed to cause, his own death. So, ah . . bring in the Jury. (Jury enters court room) Lady and gentlemen of the Jury, the Court is about to direct you to return a verdict in favor of the Defendant. As you will recall, The Plaintiff has finished presenting the testimony favorable to her side of the case. And at this time it becomes the duty of the court to review that testimony. The Court has done so and found that the evidence is such that under no view which it may lawfully take of that evidence and of the reasonable inferences arising therefrom favorable to the Plaintiff should a verdict for her be sustained. And, more specifically, the Court finds that from the evidence which is, of course, uncontradicted, John T. Ahern (sic) was a graduate engineer, that he was in charge of the crane, responsible for its operation. He was aware of the special danger attendant upon electric wires. The wire was visible. The crane was unloaded, and in its . . in that immediate area they proceeded to rig it. And, by his causing the crane to be rigged in that area, or failing to prevent it from being rigged in that area, the law says then that he is guilty of negligence which proximately contributed to cause his own injury. Now I presume to discuss this with you a few more moments, because of the special circumstances of this case. Certainly the Court, and I'm sure that you, lady and gentlemen, feel great sympathy, because of this most obvious unfortunate occurrence. But be that as it may, the law . . while it ah . . permits us to sympathize, will not permit that to be the basis for a judgment. The Court further recognizes that the right of Jury Trial is a precious . . a precious privilege to citizens of this County and this great Country of ours. So, it's with extreme reluctance that the Court does what it considers to be its duty in taking this case from your consideration, and having done so, I do direct you to return a verdict in favor of the Defendant. Mr. Clerk . ."
[2] "Plaintiff attempts to create an inference that Ahearn did not direct the boom to be raised, while the uncontradicted, testimony shows that he was the only man who did direct movements of the crane, that he made the last signals only a few seconds before the accident, and that a crane operator relies solely on signals from the ground man in charge before moving the crane in any manner.

"With reference to this latter point, Mr. Harold Sutton, superintendent of Sunshine Contractors, Inc., testified as follows: (R. 562, 563) (A. 3).
"`Q. Now, with reference * * * are you familiar with proper operating machinery ah * * * this particular crane under those particular circumstances?
"`A. I am.
"`Q. What is the proper method of procedure ah * * * of operation, as to who gives instructions and who doesn't?
"`A. Well, it's * * * when you're working a crew, you generally have it understood, one man ah * * * gives the signals. Ah * * * an operator, * * if two or more starts giving signals * * * the operator will stop. He won't take signals from anybody until they make up their minds which one is gonna give the signals. Because, you can get hurt by two people giving signals.'
"As an after thought to her contention that Ahearn did not direct the boom to be raised, plaintiff further asserts that he was unaware that it was being raised, in spite of his holding the cable extending from the end of the boom. As to that contention, Mr. Harold Sutton testified as follows: (R. 561) (A. 3)
"`Q. Now, from what you observed there, was there any way that either Mr. Ahearn or Mr. Rowe would not be aware of the fact that as they held hold of the cable the boom was being raised?
"`A. You mean, is there any way that they wouldn't know that boom was going up?
"`Q. Yes. Under the circumstances you'd just described.
"`A. Certainly not.
"`Q. Why not?
"`A. Well, they wouldn't have any pull against them if the boom stopped. As long as they had to pull against them, they would know the boom was going up.'"