486 F.2d 270
 George ORR, Plaintiff-Appellant-Cross Appellee,
v.
UNITED STATES of America, Defendant-Third-Party
Plaintiff-Appellee-Cross Appellant, Meador
Contracting Company, Inc., Third-Party Defendant.
 No. 72-3229.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 14, 1973.
 
 David R. Lewis, Jacksonville, Fla., William M. Ford, Alexandria, La., for George Orr.
 Richard L. Robison, Orlando, Fla., for Meador Contr. Co., Inc.
 John L. Briggs, U. S. Atty., Robert A. leventhal, Asst. U. S. Atty., Jacksonville, Fla., James P. Klapps, Trial Atty., Ronald R. Glancz, Morton Hollander, Walter Fleischer, Greer S. Goldman, James C. Hair, Jr., Dept. of Justice, Washington, D. C., for the United States.
 Before WISDOM, GEWIN and CLARK, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 George Orr was severely injured while working on electrical power lines on a federal installation in Florida. He brought suit against the United States under the Federal Tort Claims Act, 28 U.S.C. Secs. 2671-2680, and the Government in turn filed a third party claim against the contractor and the subcontractor, Orr's employer. After a nonjury trial, the district court found that Orr's injuries were the result of the combined negligence of the Government, Orr, and the subcontractor: the Government was 30-percent responsible, and Orr and the subcontractor were each 35-percent responsible. Apportioning damages under the comparative negligence standard of Florida's Hazardous Occupations Statute, Fla.Stat.Ann. Secs. 769.01-769.05, the court ordered the Government to pay Orr damages representing 30 percent of the total. From this judgment both Orr and the United States appeal. We affirm.
 
 
 2
 * On February 5, 1968, the United States entered into a construction contract with Meador Contracting Company, Inc. (Meador I) for the replacement of an overhead electrical circuit at Patrick Air Force Base, Florida. That same day Meador I subcontracted for the performance of the contract with Meador Contracting Company of Louisiana, Inc. (Meador II). The work, to be performed in compliance with Government safety requirements and subject to inspection and supervision by Government personnel,[1] involved the replacement of a "critical circuit" carrying electricity generated by the Government and distributed throughout the Base. The Government generated its own electricity because some of its equipment, such as radar, was too sensitive to endure the fluctuations of commercially supplied electricity. For other Base needs, the Government purchased current from the Florida Power & Light Company.
 
 
 
 * * *
 
 
 
 3
 * * *
 
 
 4
 By early July 1968 the work required under the contract had been substantially completed, and preparations were made to splice the new circuit into the remaining lines. Employees of Meador II arranged with a Mr. Bell, the Government inspector responsible for supervising Meador's performance, to cut the flow of current on the lines to be worked on. This "outage" was accomplished on Saturday and Sunday, July 13 and 14. Orr testified that on July 13 he overheard Bell advise another Meador employee that "the line was dead."
 
 
 5
 Orr ascended pole 14 on Sunday, July 14. He was not an experienced lineman.[2] For example, he neither "buzzed" the lines, to find out if they were "hot", nor employed safety equipment, such as rubber gloves or a rubber blanket. Indeed, he took no precautions at all against the possibility that one of the lines was energized.
 
 
 6
 Pole 14 held a number of wires. The top wire carried 13,000 volts purchased by the Government from the Florida Power & Light Company and distributed through Government lines on Government poles. A fellow employee had advised Orr that this line was hot. Beneath the hot wire were the critical circuit lines on which Orr was to work; these lines were not energized. Closest to the ground were other lines which Orr assumed were also dead. These lines, however, were connected to the top wire by "stringers" or "jumpers", and thus current flowed from the top to the bottom wires. Consequently, the bottom wires were energized. When he climbed the pole, Orr came into contact with one of these energized lower wires and suffered severe injuries. As a result of the accident, Orr lost both legs and a substantial portion of his vision.
 
 
 7
 Before filing this action, Orr settled a suit brought in state court against Meador I, Meador II, certain of their officers, and their insurance carriers. For $52,000[3] Orr released the defendants in that suit from any further liability for claims arising from his accident, and he agreed to "indemnify and hold harmless and defend all the parties herein released". On April 1, 1971, Orr sued the United States. The United States joined both Meador I and Meador II as third party defendants, relying on a clause in the construction contract holding Meador I "responsible for all damages to persons or property that occur as a result of [the contractor's] fault or negligence", and on a clause in the subcontract providing that Meador II agreed "that all terms and conditions of the Prime Contract are binding on this agreement, whether incorporated herein or not."
 
 
 8
 The district court found that Orr had suffered damages of $328,322, resulting from the combined negligence of the Government, Meador II, and Orr. The United States was negligent in allowing dead lines to be sandwiched between live ones on pole 14. Moreover, government inspector Bell knew, or should have known, that work would be performed on pole 14, and he should have ensured that the outage included disconnecting the stringers so that no current flowed through the bottom wires. Meador II's negligence consisted of failing to follow the safety procedures required in its contract.[4] Orr was himself negligent in not taking precautions for his own safety.
 
 
 9
 As earlier stated, the court found the Government's negligence 30-percent responsible for the accident; Meador II and Orr were each 35-percent responsible. Taking 30 percent of the total award, the court ordered judgment against the United States in the sum of $98,496.60.
 
 II
 
 10
 Under the Federal Tort Claims Act the United States waives its sovereign immunity for claims resulting from the negligent acts of its agents and accepts liability "in the same manner and to the same extent as a private individual under like circumstances". 28 U.S.C. Sec. 2674.[5] What constitutes a legal duty and when such a duty has been breached are questions to be settled in accordance with "the law of the place where the act or omission occurred". 28 U.S.C. Sec. 1346(b). See United States v. Muniz, 1963, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805. And the choice of law is not affected by the fact that the claim in question arises on federal property, such as a military installation, within a state. See Ford v. United States, 10 Cir. 1952, 200 F.2d 272. In the instant case, therefore, liability is determined by the law of Florida.
 
 
 11
 The United States maintains that, because Orr was the employee of Meador II and was working under the subcontractor's control and supervision, the Government had no legal duty to guard his safety. That responsibility, argues the Government, was solely Meador's and Orr's. The Government correctly states the general rules: the contracting owner is not usually held liable for the torts of an independent contractor, Baum v. United States, 5 Cir. 1970, 427 F.2d 215, 218, cert. denied, 400 U.S. 916, 91 S.Ct. 175, 27 L.Ed.2d 155; Roberson v. United States, 9 Cir. 1967, 382 F.2d 714, 717; Kirk v. United States, 9 Cir. 1959, 270 F.2d 110, 116; nor does the contracting owner incur a duty to the employees of an independent contractor merely by reserving the right to conduct safety inspections or to prescribe safety requirements.[6] Baum v. United States, supra; United States v. Page, 10 Cir. 1965, 350 F.2d 28, cert. denied, 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470.
 
 
 12
 But the United States owed Orr a duty flowing from a different source. Florida law will not permit one to avoid responsibility for his own negligence by employing an independent contractor to perform certain hazardous activities. When the relationship between the parties is sufficiently close and the work is sufficiently hazardous, Florida applies an exception to the general rule and requires the contracting owner to act nonnegligently toward the employees of an independent contractor. Florida Power & Light Co. v. Price, Fla.1964, 170 So.2d 293; Florida Power & Light Co. v. Brinson, Fla.1953, 67 So.2d 407; Vanlandingham v. Florida Power & Light Co., 1944, 154 Fla. 628, 18 So.2d 678. Both criteria necessary to trigger the exception are present in this case. It is clear that working in close proximity to the high tension power lines that form the channels for transporting thousands of volts of electricity is a "hazardous ous or intrinsically dangerous" activity within the meaning of Florida law. See Ahearn v. Florida Power & Light Co., Fla.App.1961, 129 So.2d 457, 461. It is also clear that during the time he was working on Patrick Air Force Base Orr was an invitee of the United States. Id. As an invitee performing hazardous duties in fulfillment of the Government's contract, Orr was owed a high degree of care which could not be delegated. The Florida Supreme Court has described the standard of care owed invitees working on high tension lines:
 
 
 13
 [W]e feel it appropriate to say that . . . where men are engaged in such dangerous work and thereby are constantly only a second from eternity the highest degree of care-short of being an insurer-is required of those operating the facility. This does not mean that there is a requirement to make the place absolutely safe or that the defendant is an insurer of the safety of the employee but it does mean that it requires the degree of care commensurate with the circumstances then existing or which may reasonably be expected to exist. Vanlandingham v. Florida Power & Light Co., 1944, 154 Fla. 628, 18 So.2d 678.
 
 
 14
 Florida Power & Light Co. v. Brinson, supra, 67 So.2d at 410-11. See also Florida Power & Light Co. v. Price, supra, at 296; Robinson v. Florida Power & Light Co., Fla.1953, 68 So.2d 406.
 
 
 15
 The Florida courts have held that what is meant by the "high degree of care" owed invitees performing hazardous jobs for independent contractors is to be determined by the circumstances of each case. Florida Power & Light Co. v. Robinson, supra. We are satisfied that the standard was not met in this case. The trial court found the Government negligent in permitting the flow of electricity through wires below the de-energized critical circuit on pole 14 when Bell, the government inspector, knew, or should have known, that work would be performed on that pole. The court found that the stringers linking the top "live" wire on the pole with the bottom wires should have been disconnected by the Government before any work was carried out. This was clearly the responsibility of the United States; the United States owned the poles and lines and controlled the distribution of current. Finally, neither Bell nor any other government employee made any attempt to warn Orr of the danger involved in working on pole 14. Indeed, Bell may have actively misled Orr by advising Meador employees, within Orr's hearing, that "the line was dead."
 
 
 16
 The findings of the trial court must be accepted by this Court unless clearly erroneous. See McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20; Market Insurance Co. v. United States, 5 Cir. 1969, 415 F.2d 459, 461. We find no support for upsetting the trial court's findings in this instance.
 
 III
 
 17
 The trial court placed 35 percent of the fault for Orr's injuries on Orr himself. Under common law principles, of course, Orr's contributory negligence would disqualify him from any recovery, regardless of the proportion of blame. The Government argues that the principles of contributory negligence should apply in this case and that a correlative holding that the Government is not liable is required. We disagree. By statute the doctrine of comparative negligence was correctly invoked by the district court.
 
 
 18
 The Florida Hazardous Occupations Statute has long protected workers in certain industries from the sometimes harsh results of the doctrine of contributory negligence. For the complete bar of contributory negligence, the statute substitutes recovery based on the proportion of blame borne by the defendant when the defendant is a "person engaged in . . . railroading, operating street railways, generating and selling electricity, telegraph and telephone business, express business, blasting and dynamiting, operating automobiles for public use, boating, when boat is propelled by steam, gas or electricity". Fla.Stat.Ann. Sec. 769.01. The Government argues unpersuasively that it does not fit within the statute.
 
 
 19
 The Government maintains that it was not "generating and selling electricity" within the meaning of the statute, and thus that its responsibility for the accident is erased by Orr's contributory negligence. Technically, perhaps, the United States was not generating electricity on Patrick Air Force Base for "sale". Rather, the Government generated electricity for its own consumption. But we consider it unsound to give the Hazardous Occupations Statute a restrictive interpretation. The Florida courts have themselves called for a liberal construction: "As the Act . . . was designed to extend and not to curtail the liability of employers to employees engaged in hazardous occupations, the language used should be given its proper meaning and effect." Gulf, F. & A. Ry. Co. v. King, 1917, 73 Fla. 325, 74 So. 475, 478.
 
 
 20
 To Orr, or to anyone else working on power lines, there is no difference in hazard between electricity sold to the public and electricity used internally by the generating entity. As the Florida courts have recognized, the danger is created by the "generation and distribution" of electricity, Ahern v. Florida Power & Light Co., Fla.App.1961, 129 So.2d 457, 461, not the fact of sale. Moreover, in the context of the remainder of the provision the "and" takes on more of a disjunctive than conjunctive flavor.[7] Thus, we do not read the provision to require that the employer participate in both selling and generating before its employees gain the benefit of the Act. Generating and/or distributing electricity is sufficient to create great risk of injury; it is, we think, sufficient to invoke the protections of the Act.
 
 
 21
 The Government asserts that the Hazardous Occupations Statute is intended only to require those engaged in a hazardous activity for profit to bear an equitable proportion of the losses resulting from injuries sustained by their employees. There is no support for this contention. Even "selling" does not imply that only private industries are intended to be covered. Furthermore, the Supreme Court of Florida has extended the coverage of the Act to governmental units. See City of Sebring v. Avant, 1928, 95 Fla. 960, 117 So. 383. Profit motive is plainly irrelevant.
 
 
 22
 Florida's Hazardous Occupations Statute provides that "[t]he persons mentioned in Sec. 769.01 shall be liable in damages for injuries inflicted upon their agents and employees". Fla. Stat.Ann. Sec. 769.02. (Emphasis supplied.) At the time of his accident, Orr was employed by Meador II. Since Orr was neither the Government's employee nor its agent, the Government argues that the Hazardous Occupations Statute, therefore, does not apply.
 
 
 23
 The Florida Supreme Court has spoken obliquely to the issue of whether employees of independent contractors may gain the protection of the Act to recover under principles of comparative negligence against the contracting owner. In Florida Power & Light Co. v. Price, Fla.1964, 170 So.2d 293, Harlan Electric Company contracted to construct an electrical distribution system for Florida Power & Light Company. The plaintiff, an employee of Harlan, was injured when a fellow employee caused the wire upon which the plaintiff was working to become energized. The court held that Florida Power & Light, as the contracting owner, was not liable under Chapter 769 in the absence of a showing that it was negligent. In the course of its opinion the court said:
 
 
 24
 It is true the defendant is engaged in selling electricity and is one of the class of persons referred to in F.S. Sec. 769.01, F.S.A., but this alone does not render it liable for injuries to an employee of its independent contractor caused by the negligence of a fellow employee of the independent contractor unless it can be shown defendant in someway contributed or concurred in the act of negligence.
 
 
 25
 Id. at 297. (Emphasis supplied.) We follow the court's implication and hold that, if a showing of negligence is made, the contracting owner may be liable under Chapter 769 for injuries to the employees of an independent contractor.[8]
 
 
 26
 After argument in this case, the Florida Supreme Court in the landmark decision of Hoffman v. Jones, Fla.1973, 280 So.2d 431 abrogated the contributory negligence doctrine and joined the growing number of states that have adopted a comparative negligence standard for all torts cases. Prior to the holding of the Florida Supreme Court, the Florida Bar struggled in the confusion created when the District Court of Appeal, Fourth District, held that despite historic and uniform practice to the contrary, comparative negligence was the proper rule for Florida. Jones v. Hoffman, Fla.App.1973, 272 So.2d 529. In an apparent attempt to end the confusion as to when the new rule would be applied, the Florida Supreme Court declared that the comparative negligence standard would be applied, inter alia, "to those cases in which the comparative negligence rule has been applied" and "to those cases on appeal in which the applicability of the comparative negligence rule has been properly and appropriately made a question of appellate review". Hoffman v. Jones, supra, 280 So.2d at 440. Because we hold that the doctrine of comparative negligence applies to the instant case under Chapter 769, we do not reach the question of whether the comparative negligence standard would be otherwise applicable to this case under the criteria set forth in Hoffman.
 
 IV
 
 27
 Orr maintains that the lower court erred in its computation of the judgment payable by the United States under Chapter 769. Judge Young below found the United States 30-percent responsible for Orr's injuries and awarded judgment against the United States for $98,496.60, a sum representing 30 percent of the total damages of $328,322 sustained by Orr. Orr contends that he should be awarded a judgment against the United States for 65 percent of the total damages since this is the percentage of culpability not borne by Orr. After a set off of $52,000 received in settlement of Orr's claim against Meador I and Meador II, Orr would then be entitled to recover a total of $161,409.30 against the United States. Orr's argument is based on the premise that under the Florida Hazardous Occupations Statute, a plaintiff is entitled to a full recovery-less a proportional amount related to his negligence-against any one negligent defendant.
 
 
 28
 Section 769.03 of the Florida Statutes provides that "the amount of recovery shall be such a proportion of the entire damages sustained as the defendant's negligence bears to the combined negligence of both the plaintiff and the defendant".[9] Orr relies on language from a number of Florida cases to buttress his position that the proper method of computation under Chapter 769 is to start with a full recovery and to diminish it by the amount of the plaintiff's negligence.[10] Each of the cases cited to us by Orr, however, deals with only one defendant; none purports to state the rule where there are multiple defendants.[11] Nor does the common law rule making each joint tort feasor liable for the entire amount of the damages properly obtain here. Although this rule has been generally followed in Florida, see, e. g., Colle v. Atlantic Coast Line R.R. Co., 1943, 153 Fla. 258, 14 So.2d 422; One Hundred Seventy Second Collins Corp. v. Rosene, Fla.App.1969, 222 So.2d 444, here we have one common law rule sought to be applied to a statute that discards another common law rule. In short, we are forced to consider the proper method of computation under Chapter 769 when there are multiple defendants to be an open question, unanswered by the Florida courts.
 
 
 29
 It is unnecessary for us to attempt an answer ourselves, because, even assuming that Orr has correctly divined the proper method of computation, by a chain of indemnification any recovery Orr might gain against the United States for that portion of the damages traceable to the negligence of Meador II would in turn be recoverable from Meador II and finally from Orr himself. The circle is complete. First, when Orr settled with Meador I and Meador II, he agreed to indemnify them for any further related claims. The applicability and enforceability of this agreement is not disputed. Second, the construction contract between Meador I and the Government provides that Meador I is responsible for any damages resulting from its negligence. In United States v. Seckinger, 1970, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224, the Supreme Court of the United States construed an indemnity agreement substantially identical to the one between Meador I and the Government in this case.[12] The Court in Seckinger held that the agreement apportioned liability between the parties on the basis of comparative negligence. Applied to this case, Seckinger entitles the Government to indemnification for any payment it makes to Orr for which, as between Meador I and the Government, Meador I must bear the blame. Although the district court did not find Meador I guilty of negligence, we think that under the indemnification agreement Meador I is responsible for the results of the negligence of its subcontractor, Meador II. Meador I agreed to ensure the compliance of any subcontractor with the safety provisions of the construction contract.[13] And in the absence of convincing evidence to the contrary, we cannot believe that the intent of the parties was to permit the contractor to eliminate the Government's right to indemnification by simply subcontracting it away. Finally, Meador II agreed to assume all the obligations that Meador I undertook in its contract with the Government. Thus, Meador II remains liable to Meador I for the results of its negligence.
 
 
 30
 If the Government were to pay Orr damages resulting from the negligence of Meador II, therefore, the Government could gain reimbursement from Meador I, Meador I could gain reimbursement from Meador II, and Meador II could gain reimbursement from Orr. It is not clear from the district court's opinion whether the court's failure to give judgment against the United States for more than 30 percent of Orr's damages resulted from the court's refusal to do a useless act in the face of the unbroken chain of indemnity, or whether it resulted from the court's belief that the proper method of computation under Florida law is to limit recovery against each defendant to that proportion of the total damages for which it is responsible. Because we endorse the first theory, we
 
 
 31
 Affirm.
 
 CLARK, Circuit Judge (dissenting):
 
 32
 It is common knowledge that working with electricity is a highly dangerous business. When the United States chose to contract this installation to a corporation specializing in such work, it was acting in complete accord with a proper recognition of this danger. The effect of the majority opinion is to place the burden of continuously supervising such a contractor upon an owner who hires a specialist to accomplish this necessary, albeit hazardous, task. The district court and the majority have wholly failed to deal with undisputed facts which I find controlling on the issue of negligence. I therefore dissent.
 
 
 33
 The contract bought and paid for this job to be done in strict compliance with adequate safety standards. More importantly, the agreement expressly provided that the price included the costs of such extra precautions as were necessary to allow the work to be accomplished during periods when the wiring was energized as well as at times when the current was off.
 
 
 34
 The government did not know that Orr, who described himself as a "climbing grunt,"[1] was not qualified as a lineman; nor did it even know that Orr was the particular person the contractor would utilize to accomplish its work on pole 14 on this date. It did know that it had contracted that no one other than qualified personnel would work in areas of possible contact with energized circuits. It also knew that the required electrical specialist could have climbed pole 14, at the time Orr hurt himself, with complete safety by following the safety procedures mandated by the contract.
 
 
 35
 The district court predicated its finding of negligence on the part of the United States upon (1) the fact it left current flowing in some of the wires on pole 14 and (2) a failure to warn Orr of the danger of working around energized circuits without following contractual procedures. (The majority adds the pure speculation that Orr may have been misled by misunderstanding a conversation between others which he overheard.)
 
 
 36
 Under the facts that are entirely without dispute and giving Orr the benefit of every contested fact and all favorable inferences, I can find no basis in this record for affixing any duty upon the United States to de-energize any of the circuits on pole 14, nor do I find any basis for imposing a duty to warn employees of an electrical specialist to do their work in accordance with the contract or to tell any particular employee of the contractor that the work as contracted for could be dangerous if not properly done.
 
 
 37
 Every condition existing on pole 14 on the occasion of this accident was not only in accordance with the terms of the agreement, but was also free from danger of electrical shock to qualified personnel acting in accordance with the procedures called for. The United States was not bound to anticipate that Meador would breach its agreement by sending an unqualified groundman up an energized pole.
 
 
 38
 Since I would reverse the findings of negligence and causation, I do not reach the majority's interpretation of Florida Power and Light Company v. Price, 170 So.2d 293 (Fla. 1964), or its Erie guess as to Florida's law of liability among joint tort-feasors where contribution is applicable.
 
 
 
 [1]
 The construction contract between the Government and Meador I provided:
 "(a) In order to provide safety controls for protection to the life and health of employees and other persons: for prevention of damage to property, materials, supplies, and equipment: and for avoidance of work interruptions in the performance of this contract, the Contractor shall comply with all pertinent provisions of Corps of Engineers Manual, EM 385-1-1, dated 1 March 1967, entitled 'General Safety Requirements', as amended, and will also take or cause to be taken such additional measures as the Contracting Officer may determine to be reasonably necessary for the purpose.
 (c) The Contracting Officer will notify the Contractor of any noncompliance with the foregoing provisions and the action to be taken. The Contractor shall, after receipt of such notice, immediately take corrective action . . . .
 (d) Compliance with the provisions of this article by subcontractors will be the responsibility of the Contractor.
 The work will be conducted under the general direction of the Contracting Officer and is subject to inspection by his appointed inspectors to insure strict compliance with the terms of the contract. No inspector is authorized to change any provision of the specifications without written authorization of the Contracting Officer, nor shall the presence or absence of the inspector relieve the Contractor from any requirements of the contract."
 
 
 [2]
 Although Orr was not a qualified lineman, he was performing and being paid as a lineman at the time of the accident
 
 
 [3]
 Orr also received as settlement: $40,000 workmen's compensation, $5,000 for medical expenses, and $8,000 for attorney's fees
 
 
 [4]
 The contract between the United States and Meador I required the contractor to comply with the provisions of Corps of Engineers Safety Manual, EM 385-1-1. The Manual provided that circuits be de-energized before work was started and that rubber gloves and protective equipment be used when it was necessary to work on energized lines. Meador II became bound by these requirements when it subcontracted for the job
 
 
 [5]
 The Federal Government is in no circumstances liable under the Federal Tort Claims Act in the absence of fault. Dalehite v. United States, 1953, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427; Emelwon, Inc. v. United States, 5 Cir. 1968, 391 F.2d 9, cert. denied, 393 U.S. 841, 89 S.Ct. 119, 21 L.Ed.2d 111
 
 
 [6]
 See Note 1, supra
 
 
 [7]
 If the other conjunctions in the provision were given the same strict connective effect the Government argues is proper for "generating and selling", a telephone company could avoid liability under the Act by not also engaging in telegraph business, or a construction company could avoid the Act by utilizing some blasting material other than dynamite
 
 
 [8]
 The Government argues that a contrary conclusion is required by the following statement, also from Price:
 "Unless and until it is shown the contracting owner by positive act of negligence or negligent omission on his part causes injury to the independent contractor or to the latter's employee or employees, such owner will not be held liable. The employees of the independent contractor do not become the employees of the contracting owner within the contemplation of Chapter 769, F. S., F.S., nor are they under his direction and control. Their negligent acts do not become his responsibility under the doctrine respondeat superior."
 
 
 [170]
 So.2d at 298. (Emphasis supplied.) In context it is clear that in the italicized portion above the court was referring to negligent fellow employees of the independent contractor, not to employees of the independent contractor who are injured through the negligence of the contracting owner
 
 
 [9]
 The computation of damages under the Federal Tort Claims Act is controlled by state law. Feeley v. United States, 3 Cir. 1964, 337 F.2d 924
 
 
 [10]
 Tampa Electric Co. v. Hardy, 1939, 139 Fla. 142, 190 So. 478, 480 ("[I]f both were at fault the recovery should be decreased by proportion that employee's negligence bore to the whole."); Kirkland v. City of Gainesville, 1936, 122 Fla. 765, 166 So. 460, 464 ("[T]here may be a recovery of damages to be diminished in proportion to the negligence, if any, of the decedent".); Key West Electric Co. v. Higgs, Fla.1931, 136 So. 639, modified on other grounds, 140 So. 327 ("[T]he recovery shall not be full damages, but only a diminished sum bearing the same relation to the full damages that the negligence attributable to the defendant bears to the negligence attributable to both; the purpose being to exclude from the recovery a proportional part of the damages corresponding to the employee's contribution to the total negligence.")
 
 
 [11]
 Indeed, the recent case of Hoffman v. Jones, supra, hints that the proper method of computation in the case of multiple defendants in a comparative negligence situation is to award judgment against a defendant only in the amount representing his share of the fault. The court said: "A primary function of a court is to see that legal conflicts are equitably resolved. In the field of tort law, the most equitable result that can ever be reached by a court is the equation of liability with fault." Id.280 So.2d at 438
 
 
 [12]
 Federal law controls the construction of the clause. United States v. Seckinger, 397 U.S. at 209, 90 S.Ct. 880; United States v. Alleghany, 1944, 322 U.S. 174, 183, 64 S.Ct. 908, 88 L.Ed. 1209
 
 
 [13]
 See Note 1, supra
 
 
 [1]
 The classification of "climbing grunt" which Orr assigned to himself in his testimony is paradoxical. The testimony disclosed that a "grunt" is the colloquial title given to a ground-based helper whose task is to pass equipment and materials up to linemen who are at work on overhead circuits