84 So.2d 34 (1955)
Dr. Robert H. MONTGOMERY and Dr. Arthur P. Buchanan, Appellants,
v.
Cynthia Ann STARY, an Infant, by Earl E. Stary, her father and next friend, Appellee.
Dr. Robert H. MONTGOMERY and Dr. Arthur P. Buchanan, Appellants,
v.
Earl E. STARY, Appellee.
Supreme Court of Florida. Special Division A.
December 14, 1955.
Rehearing Denied January 13, 1956.
*35 T. Paine Kelly, Jr., of Macfarlane, Ferguson, Allison & Kelly, Tampa, for appellant for Robert H. Montgomery.
G.T. Shannon of Shackleford, Farrior, Shannon & Stallings, Tampa, for appellant Arthur P. Buchanan.
Cody Fowler, James E. Thompson and Margaret Deaton of Fowler, White, Gillen, Yancey & Humkey, Tampa, for appellee.
HOBSON, Justice.
This is an appeal by defendants from adverse judgments of the circuit court in two medical malpractice cases. One of the actions was brought on behalf of an infant, Cynthia Ann Stary, by her father and next friend, Earl Stary, and the other was brought by the father, Earl Stary. The two actions were consolidated in the trial court and upon this appeal.
*36 The complaints in both cases allege that the appellant doctors "negligently and carelessly suffered and permitted" Cynthia Ann Stary to be seriously and permanently injured, in that her left arm, fingers and hand were so severely scalded and burned that the fingers and thumb were lost.
The evidence shows that Dr. Montgomery, the Stary family doctor, took care of Mrs. Stary in her pregnancy. In June, Dr. Montgomery told Mrs. Stary that he was going on vacation the month of September, when the baby was expected. He told her he was keeping Dr. Buchanan informed of her condition and that in case she could not contact him (Montgomery) she should call Dr. Buchanan. Mrs. Stary testified Dr. Montgomery told her that if she wished him to deliver the baby she could have a caesarean operation, as a matter of convenience. Mrs. Stary agreed, the operation was performed by Dr. Montgomery, assisted by Dr. Buchanan, and the child was born about 8:20 a.m., on August 26, 1952, about 20 days before her birth would normally have occurred. It was a small baby, weighing less than seven pounds. After being cared for by the head nurse and examined by Dr. Montgomery and found apparently normal, the baby was removed to the nursery. At about 9:45 a.m. it was discovered that the child's left arm was blanched chalk white. Dr. Montgomery ordered hot towels, which were produced. Dr. Montgomery wrapped these towels around the baby's hand and arm, and within three or four minutes from the time the first towel was applied the color of the baby's arm began to improve. While he was applying the hot towels, Dr. Montgomery called Dr. Buchanan, who immediately came to the nursery, observed the treatment, and apparently concurred in it.
After several minutes of treatment. Dr. Montgomery telephoned a Dr. Hitchcock, a pediatrician, in Orlando, and had a conversation with him, after which Drs. Buchanan and Montgomery conferred outside the nursery door. The treatment was continued. By 10:30 a.m. the arm was pink to the elbow. At 11:30 a.m. the color had descended to the lower third of the forearm. Thereafter a blister appeared near the middle of the inner side of the forearm. This blister increased in size, and the hot pack treatment was discontinued at 5:00 p.m. By 8:00 p.m. of the same day, the hospital records show that the thumb and fingertips of the left hand appeared swollen and cyanotic.
The baby was born on Tuesday. On Friday of that week Dr. Montgomery left on vacation and Dr. Buchanan took over entirely. Mrs. Stary was discharged from the hospital on September 1, 1952. About September 11, Dr. Buchanan told the parents that there was a slight burn on the baby's arm and that the fingertips might require amputation. He suggested that they take the baby to a Dr. Douglas in Orlando, as they did. In Orlando, they learned that gangrene had set in. On September 19, the baby was admitted to an Orlando hospital for about a week and was thereafter taken to Orlando daily for about a month. The fingers and thumb of the left hand were virtually lost, and Mrs. Stary took the baby to Chicago in December and placed her in the care of a surgeon, a plastic surgeon, and a pediatrician. These doctors recommended future treatment and surgery to make the hand as functional as possible. The required surgery is complicated and difficult.
The jury returned verdicts in favor of Earl Stary for $5,000 and in favor of the infant for $10,000. Appellants first contend that the evidence is insufficient to sustain these verdicts. Much of the voluminous record and briefs in this case is devoted to testimony and argument as to whether or not the application of the hot pack treatment to the infant's arm and hand under the circumstances was acceptable medical practice, or whether some other treatment should have been used. We wish to make clear at the outset our view that the principal question to be resolved on this appeal is not whether the treatment prescribed was proper or improper. It is whether there is competent substantial evidence to support the verdicts upon the theory that the treatment was negligently applied, with the result that the fingers and thumb were needlessly lost by reason of the application of *37 extreme heat rather than from causes which the treatment could not eliminate.
If there was negligence, it must have occurred in the course of the hot pack treatment, or between about 9:45 a.m. and 5:00 p.m. on the date of the baby's birth, and it is upon this period that our primary attention must focus. It is not suggested that the delivery of the baby was not properly accomplished, nor is it contended, as it was in Baldor v. Rogers, Fla., 81 So.2d 658, that any action should have been taken by the doctor after the treatment selected was substantially completed.
There was testimony from which the jury could have found the following facts:
When the loss of color in the baby's arm was discovered, Dr. Montgomery commenced to apply hot towels. The baby began to scream and wail. A nurse handed the towels to Dr. Montgomery through the window of the nursery, having soaked them at a hot water faucet which was located a few feet from the nursery. The towels were steaming hot. The nurse was "putting the hot towels under steaming hot water, wringing them out on the ends" and handing them to Dr. Montgomery, who was immediately applying them to the baby's hand and arm. The water used was "hot faucet water as hot as you could get out of the faucet." Dr. Montgomery personally changed the towels every two minutes for about fifteen minutes. During the call to Dr. Hitchcock and the conference with Dr. Buchanan, the nurse had applied the towels. Dr. Montgomery told the nurses that he wanted the towels hotter, he wanted them steaming hot. Before leaving the nursery, about a half hour after the treatment had commenced, Dr. Montgomery directed the nurse to change the towels about every ten minutes instead of every two or three, as had been done up to that time.
As the pink color descended, the towels were correspondingly lowered. Since the upper third of the forearm appeared normal by 11:30 a.m., it appears that the lower forearm, wrist and hand were wrapped in steaming hot towels for several hours longer than the remainder of the arm. Dr. Buchanan visited the nursery several times throughout the morning, observed the treatment, and did not change it. The nurse reported the baby's condition from time to time. When Dr. Montgomery left the hospital at about noon or 12:30, the baby's arm appeared normal to the middle of the forearm, below which a blister had formed. Dr. Montgomery testified:
"A. When I left about 12 or 12:30 the baby's arm was essentially normal down to approximately here (indicating).
"Q. When you say `here'  A. Down to the middle of this lower forearm, this is the forearm, down to the middle of the forearm. The remaining (sic) of the hand was spots of pink and spots of cyanotic or bluish pink, various shades of blue, it was mottled and it had the blister about so."
He instructed the nurse to continue the application of hot towels every ten minutes.
The hospital records show a blister on the baby's arm at 2:00 and at 2:30 the head nurse called Dr. Montgomery and told him about it. His orders were to apply vaseline strips (used for burns) and continue the hot towel treatment. By 3:30 the blister had increased in size. Dr. Montgomery did not return to the hospital until 5:00, and at that time he ordered the treatment discontinued.
At 9:30 p.m. on the same day, the nurses contacted Dr. Montgomery, who ordered that the baby be given streptomycin "and continue vaseline strips, apply to left hand." The next day Dr. Montgomery ordered Furicaine ointment, which is used for burns, applied to the left hand and arm. On the same day (Wednesday) Dr. Montgomery admitted to the baby's mother that he had burned the baby's arm, but said "it was just a slight burn and you won't have anything to worry about." On Friday of that week, just before he left for his vacation Dr. Montgomery apologized to Mrs. Stary for burning the baby's arm, but said "it isn't anything serious, the worst that can happen *38 is she will lose her fingernails because the blood vessels are broken under them."
In sum, the jury could have found that for seven and one half hours the baby's hand, wrist and lower arm were wrapped in steaming hot towels continuously, every two or three minutes for the first half hour and every ten minutes thereafter, and that the treatment was continued without respite in spite of increasing evidence of burns. The jury could further have found from the medical testimony that the skin of a premature baby, such as this, is thinner and offers less protection than the skin of a baby delivered at the end of the natural period of gestation. It could also have found that wet heat continuously applied to tissue is cumulative, that the baby's tiny thumb and fingers would have been heated through more rapidly and thoroughly than the remainder of the arm, that Dr. Montgomery admitted the burns, and that subsequent treatment was entirely consistent with the theory that the arm and hand had been burned.
Appellant Buchanan contends that his own participation in the administering of the treatment was insufficient to justify the verdicts against him. It will be recalled that he concurred in the treatment given, and was present in the early stages when Dr. Montgomery was applying the towels. This of itself might not have been a predicate for liability. But he admitted on the stand that he came back and examined the baby once in the middle of morning, and Head Nurse Birmingham testified that Dr. Buchanan came back several times during that morning. He did not apply or feel of the towels. The jury could have found that by his actions Dr. Buchanan elected to participate in supervising the treatment given the child, and that he failed to use due care in not checking the temperature of the hot applications.
This brings us to the question of whether it was sufficiently proved that the heat which was applied proximately caused the loss of the fingers and thumb.
The original blanched appearance of the arm was caused by a failure or restriction of the blood supply to that member, occurring from unknown causes. Appellants contend that it was failure of circulation, and not the heat, which caused the gangrene and sloughing off of the lost members.
Gangrene is merely the death of tissue, and thus, by definition, may be caused by burning as well as by continued failure of circulation. The medical testimony as to the cause of the death of tissue in this case is in conflict. The jury must have found that it was proximately caused by burning, and our inquiry must be directed to whether this determination is supported by competent substantial evidence.
Dr. Nicholas, a surgeon from Chicago, called as a witness by plaintiff-appellees, had examined the baby three times, the first occasion being about three months after her birth. His qualifications as a surgeon were extensive and unquestioned. In connection with his first examination of the child, he testified in part as follows:
"Q. Did the baby have any scars on her left arm at that time? A. Yes there was a deep scar present on the forearm in this case and the scar of course was recent and showed the appearance of a burned scar.
"Q. Was it in your opinion a burned scar? A. It was, yes I have seen many children with burns and I had the opportunity to work on burned surfaces in military hospitals for a year and a half in England where we had cases sent from all over the United Kingdom and Europe and I would say this is a burn scar. In addition to that, the fingers had just at this time separated and come off and the ends where the bones had fallen off were just at the point of healing and that was when I saw this baby for the first time.
"Q. Were there any burn scars on the hand? A. Yes there are burn scars on the hand, they can be seen at this time although they are not so prominent as they were close to the time of the burn."
*39 He further testified that he had caused x-rays to be made, and that there was bone damage from heat, and he gave his opinion that "the scars and the loss of fingers and thumb were due to burning." Upon cross-examination, Dr. Nicholas was asked for facts upon which his opinion was based, and he testified that the history of the case given him by the family was one relevant factor. Examined about this history, he said he had been told that the baby's fingers were swollen and blistered some time earlier than other evidence shows them to have been. This other evidence was not brought to his attention for its possible effect upon his opinion, however, and we do not consider the disparity sufficient to necessitate a reversal.
Several doctors called as witnesses by appellants expressed the opinion that the loss of the fingers was caused by the original interruption of circulation, but this was a jury question which was resolved in favor of appellees. Compare Roberts v. Wofford Beach Hotel, Fla., 67 So.2d 670.
It follows, and we hold, that the jury was authorized to find, on this record, that the towels were applied too hot, as the appellant doctors knew or should have known, and that the injuries to the infant were proximately caused by this negligence. There was no testimony that it was necessary to burn off the extremities to save the child's arm. To the contrary, the consensus of medical testimony was to the effect that where the heat treatment is used, the temperature should not be excessive. Generally the recommended temperature was placed at or near normal body temperature.
Appellants next contend that the trial court erred in ruling that Dr. Montgomery could not testify as to what Dr. Hitchcock, the Orlando pediatrician, told him over the telephone shortly after treatment was commenced. Dr. Hitchcock was not called as a witness. The question objected to was "Will you tell us, please, what Dr. Hitchcock told you with reference to further treatment of the child?" The trial court sustained a hearsay objection. Appellants argue that the testimony sought to be adduced was not hearsay, because it was not offered to prove the truth of the matter asserted. It was not, however, made clear to the trial judge, nor is it clear to us, precisely what it was offered to prove. After the ruling on the objection, there was no proffer of expected testimony. No unobjectionable purpose was apparent from the question, and the question itself did not suggest an answer which would have been relevant for any purpose aside from such independent testimonial value as the answer may have had as tending to approve the treatment administered by Dr. Montgomery. For such purpose Dr. Hitchcock should have been called as a witness. Under similar circumstances we have held that we cannot review the ruling of the trial court. Berger v. E. Berger & Co., 76 Fla. 503, 80 So. 296. See also Atlantic Coast Line R. Co. v. Shouse, 83 Fla. 156, 91 So. 90. On its face, the question sought to elicit hearsay, and would have deprived appellees of their right to cross-examine Dr. Hitchcock. No error in this ruling has been made to appear.
Appellants next urge that the trial court erred in overruling their objections to testimony by three physicians from Chicago and its environs as to the propriety and acceptability of the treatment administered to the infant in this case, in the absence of a showing that they had practiced in a community similar to Lake County, Florida. The rule contended for, as stated by counsel for appellant Montgomery, is that "no expert testimony is admissible to show a failure on the part of a physician to employ a proper or acceptable treatment unless the expert is first qualified regarding his knowledge of the practice and treatment usually employed by physicians in the particular locality involved, or at least some similar community." Appellees point out that this rule was originally formulated when communications were slow or virtually non-existent, and that it has lost much of its significance today with the increasing number and excellence of medical schools, the free interchange *40 of scientific information, and the consequent tendency to harmonize medical standards throughout the country. We believe appellees' arguments to be well taken, but we do not in any event consider the rule to necessitate a reversal under the facts of this case. Of all of the testimony of the three Chicago doctors, (two testified by deposition and one, Dr. Nicholas, in person) only that of Dr. Nicholas, on proximate cause, was needed to sustain the verdicts of the jury. Proximate cause does not change with the locality. The jury could have found, as a matter of their own common knowledge and experience, and independent of expert testimony as to acceptable medical practice, that the fingers and thumb of a premature infant were needlessly burned off, and that this could not be considered acceptable medical practice in any community. See Benson v. Dean, 232 N.Y. 52, 133 N.E. 125; Vergeldt v. Hartzell, 8 Cir., 1 F.2d 633; Wilson v. Martin Memorial Hospital, 232 N.C. 362, 61 S.E.2d 102; Richeson v. Roebber, 349 Mo. 132, 159 S.W.2d 658, 141 A.L.R. 1; Mehigan v. Sheehan, 94 N.H. 274, 51 A.2d 632; and Lanier v. Trammell, 207 Ark. 372, 180 S.W.2d 818.
Appellant Montgomery next contends that the trial court erred in refusing to give certain requested charges. We have examined the charge given as a whole, Dowling v. Loftin, Fla., 72 So.2d 283, and find that it adequately covers the law relevant to the issues in this case. There is no error.
These are extremely difficult cases, and pathetic in their implications. The principal questions, however, have been resolved by the jury under proper instructions. It follows that the judgments appealed from must be, and they are hereby,
Affirmed.
DREW, C.J., TERRELL, J., and STANLY, Associate Justice, concur.