**Marrian KOLESAR and Andrew J. Kolesar, her husband, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 9698–M.**

United States District Court
S. D. Florida,
Miami Division.

Aug. 11, 1961.

Richard F. Ralph, Sherouse & Corlett, Miami, Fla., for plaintiffs.

**9.** See Note 3.

Daniel Pearson, Ass't U. S. Atty., Miami, Fla., for defendant.

CHOATE, District Judge.

This is an action for personal injury by Marrian Kolesar and for loss of consortium by her husband, Andrew J. Kolesar, arising from an operative episode at Key West Naval Hospital, Key West, Florida, on January 21, 1958, under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq. The defendant answered admitting the operation of the hospital by the Navy, a Federal Agency; the acceptance of the plaintiff, Marrian Kolesar, as a patient, as the dependent wife of Andrew J. Kolesar, an enlisted man in the United States Navy; the undertaking of the operation; and generally denied negligence. The cause came on for trial on July 18–20, 1961, and the Court having considered the pleadings and the evidence, now files the following findings of fact and conclusions of law:

Findings of Fact.

1. On and before January 20, 1958, to include the date of trial, the plaintiff, Andrew J. Kolesar, was a Chief Petty Officer, in the United States Navy, an Armed Service of the United States administered by the Department of the Navy and of Defense; Federal Agencies of the sovereign defendant.

2. The plaintiffs, Andrew J. Kolesar, and Marrian Kolesar, were married in 1954 and have remained so since.

3. Marrian Kolesar was the dependent wife of Andrew J. Kolesar, and as such was admitted on January 20, 1958, to the Key West Navy Hospital, Key West, Florida, within the Southern District of Florida, for surgery in the nature of an exploratory laparotomy scheduled for January 21, 1958, after a history of abdominal pain in the lower right quadrant.

4. Marrian Kolesar was 32 years of age and, although she had an extensive record of female complaints and one operation, she had good lungs and heart, and was a good surgical risk at the time of her admission and prior to the operation being undertaken.

5. On January 21, 1958, Marrian Kolesar was prepared for surgery and spinal anesthetic administered. Assigned to the operation was Lt. Comdr. Frank Ostapowicz, M. D.; Lt. Robert P. Johnson, M. D., to assist Dr. Ostapowicz; Lt. Julius R. Earle, M. D., as anethesiologist; Corpsman Gary and Corpsman McClosky, as scrub and circulating corpsmen. Another corpsman was present as a trainee. Lt. Comdr. Laurette Picard was operating room supervisor at the time. While not assigned formally to the operation, she followed the practice of staying in and supervising the operation room involving female patients closer than any of the other operating rooms in the suite which might be in operation that day. Nurse Herring, a Navy nurse, also participated in operative procedures although not originally assigned as a member of the surgical team.

6. At 10:08 a. m. the patient was draped. Dr. Ostapowicz asked Dr. Earle if it was alright to proceed and received an affirmative reply. An existing laparotomy scar was excised at 10:10 which did not bleed. Dr. Ostapowicz immediately announced this fact and asked Dr. Earle to check the patient. Dr. Earle reported a blood pressure of 40 over zero and then 0, and pulse unobtainable. Dr. Earle introduced ephedrine intravenously and thereafter listened to the heart and without comment put the ear plugs in Dr. Ostapowicz's ears who after listening requested a long needle and the summoning of Dr. Moore, who was a Naval officer and general surgeon. Dr. Johnson traumatized the patient's chest, listened for heart sounds and was then handed a syringe with a long needle containing 2 cc of ephedrine by Dr. Ostapowicz. 1 cc was injected into the patient's heart chamber and the remaining cc was injected into the heart musculature. Dr. Johnson again listened to the patient's heart and heard nothing.

7. When Dr. Ostapowicz called for a long needle and Dr. Moore, Corpsman

Gary left the operating room and encountered Nurse Picard seated at her desk in the operating suite about 20 feet from the operating room entrance. After asking why he had broken scrub Nurse Picard moved from her desk past the entrance to the operating room, entered the doorway into a closet or room where drugs were secured.. Obtaining a bottle of levophed she then proceeded to the operating room where she withdraw the ephedrine into the syringe with a long needle which she gave to Dr. Ostapowicz and which he then gave to Dr. Johnson.

8. Dr. Karl B. Absolom appeared in the operating room, was gowned and gloved by one of the corpsmen and proceeded to the operating table when he was handed the knife Dr. Ostapowicz held in his hand. Dr. Absolom proceeded to perform an open thoracotomy, without the presence of bleeding, and had his hand on the patient's heart in approximately 45 seconds from the time he made the incision. After 5 or 10 pumping motions the heart resumed a normal but rapid beat.

9. Thereafter a blood transfusion was instituted and the chest and abdominal incisions were closed.

10. The human brain is the first organ of the body affected adversely by a lack of oxygen which is supplied by the circulation of blood pumped by the heart with oxygenation of the blood by the lungs and respiratory processes. At the time the patient's abdominal incision did not bleed and she had no discernable pulse it should have been clearly apparent that the patient's brain was being deprived of a necessary supply of oxygen because of circulatory insufficiency.

11. A deprivation of an adequate supply of oxygen to the brain of a human being beyond the period of four minutes will most likely cause irreversible damage to the higher centers of the brain tissue and results in a neurological deficiency in a human being. The extent of brain damage has a direct relation to the passage of time. This period was generally accepted by the medical profession on January 21, 1958.

12. Acceptable medical practice at Key West Naval Hospital on January 21, 1958, dictated a diagnosis of cardiac arrest and circulatory insufficiency as to Marrian Kolesar at the time her abdominal incision did not bleed and she had no obtainable pulse.

13. No notice was taken, or record kept, of the passage of time during either the various resuscitative procedures adopted, or in connection with the initiation of a thoracotomy so as to manually restore circulation within the four minute period.

14. A period materially in excess of four minutes occurred between the time Marrian Kolesar's abdominal incision did not bleed, and she had no obtainable pulse, until effective resuscitative procedures were obtained by manual cardiac massage which restored the flow of blood to the patient's brain. This constituted a departure from acceptable medical practice, at Key West Naval Hospital on January 21, 1958.

15. Cardiac arrests and circulatory insufficiencies were generally known on January 21, 1958, to be an anticipated occurrence in connection with surgery. It was generally accepted in the Medical Profession on January 21, 1958, that a surgeon undertaking a surgical procedure should possess, as a part of his qualifications, the ability to perform a thoracotomy and manual cardiac massage.

16. Marrian Kolesar is one hundred per cent or totally and permanently disabled as a result of brain damage or neurological deficiency resulting from the foregoing deprivation of oxygen to her brain during the operation at Key West Naval Hospital on January 21, 1958. She has been a patient and has received care at St. Albans Naval Hospital, after being transferred there from Key West Naval Hospital, to date without cost or charge. Dependent's care is generally limited to one year's hospitalization and there is no vested right to hospitalization or medical care for dependents of military personnel under existing statutes and regulations. She was tube fed for approximately one and a half years following

the operation and thereafter has been on a diet of Pureed foods to date. She is incontinent of bowel and bladder, and has had a Foley catheter since the onset of her injury. She is not ambulatory but can support her weight in an upright position if assisted and supported. She is described as vegetative in the defendant's hospital records. She has lost her power of speech except for an occasional word. She is sensitive to pain and can indicate where she hurts. She can hold her head up for variable periods of time and has a neck brace to lend support in doing so at other times. She can comprehend questions which she answers by head movement or by winking signals for yes or no, she watches television. From recent photographs and testimony her problems appear to be generally comparable to that of a paraplegic.

17. Marrian Kolesar was 35 years of age at the date of trial. The average normal woman of such age would have a life expectancy of approximately 40 years. A totally disabled woman of such age has an average life expectancy of approximately 10 to 23 years. Marrian Kolesar's life expectancy on the basis of these averages of experience and the evidence herein has been shortened to approximately 10 years.

18. Andrew J. Kolesar was 38 years of age at the time of trial and had completed approximately 18 years' military service. He will be eligible for retirement in approximately 2 years from the date of trial. The married life of the plaintiffs was a happy and compatible one. It was the plan of plaintiffs at the conclusion of Chief Kolesar's 20 years of service to retire from the service and purchase a house and acreage in Illinois which would supplement civilian employment income of Chief Kolesar. Mrs. Kolesar had lived on a farm with her in-laws during a period of Chief Kolesar's sea duty during their marriage and was familiar with farm life in Illinois. Marrian Kolesar and her husband enjoyed and shared their friends and acquaintances and were compatible with the friends of each. They enjoyed the usual and normal social and recreational activities with friends, movies, fishing, and participation in the playing of soft ball. During the period of their marriage until the date of the operation in question, Mrs. Kolesar performed the usual duties of a housewife including cooking, sewing and cleaning.

19. Marrian Kolesar requires now, and will in the future require 24 hour nursing care which will not require a registered nurse except that some medication would have to be administered by a doctor or registered nurse. She would have to be under the supervision of a doctor who would make at least one personal call a week. A reasonable cost of care, medicine, and medical attention for Marrian Kolesar is an amount of $115 per week. On the whole, the Court considers an award of this amount to Andrew J. Kolesar for the life expectancy of Marrian Kolesar of approximately 10 years reduced to present value at 4 per cent to be justified. The present money value of $1 per year for 10 years invested at 4 per cent according to the American experience table is $8.111. The present money value of $5,980 per year for 10 years reduced to present value is $48,503.78.

20. Marrian Kolesar has experienced pain and suffering since the date of operation and her condition is and will be the subject of embarrassment. This latter factor is to be weighed in assessing her past and future pain and suffering in addition to the matters such as tube feeding and catheter previously alluded to. The sum of $5,000 is fixed as damages for Marrian Kolesar's past and future pain and suffering.

21. The general mental and physical health and ability to live a normal life of Marrian Kolesar has been lost as a result of her injuries and her damages in this regard are fixed at $15,000, for her life expectancy of 10 years.

22. Andrew J. Kolesar's damages for loss of consortium in the past are fixed at $2,000. His damages for future loss of consortium is fixed at $8,000.

23. This case by its inherent nature involves a field of law of a special nature and involving medical questions. This case was thoroughly made the subject of discovery processes and preparation for trial on the questions of liability as well as damages. Capable and experienced counsel performed outstanding service in the preparation and presentation of the evidence on trial. The 20 per cent limitation on attorney's fees contained in the Act under which this action is brought is much less than the customary fees charged in this community and the minimum contingency fee contained in the minimum fee schedule of the Dade County Bar Association. I consider this case warrants the award of 20 per cent of the amount of the recoveries as reasonable attorney's fees to be paid out of, but not in addition to, the amounts of the judgment. From plaintiff Marrian Kolesar's judgment plaintiff's counsel are awarded as reasonable attorney's fee $4,000 and from the plaintiff Andrew J. Kolesar's judgment plaintiff's counsel are awarded as reasonable attorney's fee $11,700.75.

### Conclusions of Law.

1. The Court has jurisdiction over the parties and subject matter of this action.

2. Military personnel of the defendant while acting in line of duty negligently failed to promptly diagnose cardiac arrest and restore circulation of blood and oxygen to the brain, in reference to Marrian Kolesar, at Key West Naval Hospital on January 21, 1958, which negligence is the proximate cause of her condition.

3. Although legalistically dicta the Supreme Court of Florida in Montgomery v. Stary, Fla.1955, 84 So.2d 34, agreed with appellee's argument pointing out the locality rule of medical standards was originally formulated when communications were slow or virtually nonexistent, and that it has lost much of its significance today with the increasing number and excellence of Medical Schools, the free interchange of scientific information, and the consequent tendency to harmonize medical standards throughout the country. While dicta in the case, it is an expression of the Supreme Court of this State and one which the court took pains to forcefully express. I find it to constitute a part of the law of Florida. It has particular significance in reference to a Federal hospital and a military community, administered on a national basis, wherein Naval Medical officers from many medical schools, and many states, practice without being subject to local board examinations otherwise required of personnel practicing medicine in the state wherein the hospital is located. Such an institution is a community apart and cannot be said to have contributed nothing to the standards of its geographical location or unto itself.

4. As in Montgomery v. Stary, supra, basic objective facts exist in this case and were known. Whatever the semantics of "arrest", it cannot be considered accepted medical practice in any community to permit the brain to suffer irreversible damage as a result of an unreasonable lapse of time materially in excess of four minutes. See also Atkins v. Humes, Fla.1959, 110 So.2d 663.

5. Therefore, I find that plaintiff, Marrian Kolesar, is entitled to judgment against the defendant in the amount of $20,000. From Marrian Kolesar's judgment, plaintiffs' counsel, Sherouse & Corlett, and Richard F. Ralph, are awarded as a reasonable attorney's fee $4,000 to be paid out of, but not in addition to, the amount of such judgment.

6. I find that plaintiff, Andrew J. Kolesar, is entitled to judgment against the defendant in the amount of $58,503.78. From Andrew J. Kolesar's judgment, plaintiffs' counsel, Sherouse & Corlett, and Richard F. Ralph, are awarded as a reasonable attorney's fee $11,700.75 to be paid out of, but not in addition to, the amount of such judgment.

7. Judgment with costs is being entered herewith.