224 So.2d 420 (1969)
Leroy E. TALCOTT, Jr., and Donald Andrus, Appellants,
v.
Ellen Morgan HOLL, an Incompetent, by and through Her Guardian Central Bank & Trust Co., Appellee.
No. 67-765.
District Court of Appeal of Florida. Third District.
June 17, 1969.
Rehearing Denied July 25, 1969.
Carey, Dwyer, Austin, Cole & Selwood, and Edward A. Perse, Miami, for appellants.
*421 Podhurst & Orseck, Colson & Hicks, Spence, Payne & Masington, Miami, for appellee.
Before CHARLES CARROLL, C.J., and PEARSON and SWANN, JJ.
CHARLES CARROLL, Chief Judge.
This is an appeal by two of the defendants (doctors) against whom a judgment was entered, based on a jury verdict, in an action for damages for personal injuries alleged to have been caused by negligence of the defendants in post operative treatment of the plaintiff, who sued through a guardian.
The basic facts are disclosed in an opinion of this court which affirmed a summary judgment for the defendants (171 So.2d 412), and in the opinion of the Supreme Court which, on certiorari, quashed our affirmance of the summary judgment and remanded the cause for further proceedings (191 So.2d 40).
Thereafter, on trial of the cause before a jury, a verdict was rendered in favor of one of the defendants, Glenn Curtis Austin, and a verdict was rendered in favor of the plaintiff against the defendants Leroy E. Talcott, Jr., Donald Andrus and Victoria Hospital, Inc., in the amount of $1,500,000. This appeal by Talcott and Andrus seeks reversal of the judgment entered against them on the latter verdict.
After verdict, the defendants who have appealed filed a motion in the trial court under Rule 1.480(b) RCP, 30 F.S.A. to set aside the verdict and judgment and for a directed verdict to be entered in their favor, and joined therewith a motion for new trial setting forth fifteen grounds, including a ground contending the verdict was excessive. The defendant Victoria Hospital, Inc., (which has not joined in this appeal) filed similar motions, including grounds claiming excessiveness of the verdict and moving (in the alternative) for reduction of the amount of the verdict by remittitur. Those motions were denied by the trial court.
Appellants present three points. First, a contention that the medical expert testimony was insufficient to establish a prima facie case; second, that it was error to permit the plaintiff to be brought into the courtroom during the trial on a stretcher "and exhibited before the jury ostensibly for use by Dr. Kaplan as demonstrative evidence;" and third, that the trial court erred in denying the "motion for new trial and/or remittitur grounded on the manifestly gross excessiveness of the verdict."
On considering appellants' first contention in the light of the record and briefs we find it is without merit. Without attempting a detailed discussion of the extensive evidence, we conclude from an examination of the record that the jury's finding of negligence of appellants was supported by substantial competent medical evidence from which the jury could decide that contrary to proper and accepted medical practice, the plight of the plaintiff was proximately caused by the administration to her of several drugs in excessive strength or amounts, the individual and cumulative effects of which were such as to reduce the oxygen intake of the plaintiff to an extent and over a period sufficiently prolonged to cause her to suffer substantial brain damage, with resultant extensive permanent mental and physical impairment.
With regard to appellants' second contention, we find no error in the action of the trial court in permitting Mrs. Holl to be brought into the courtroom on a stretcher. As the plaintiff in the case, she was entitled to be present. However, the period she was in the courtroom was only a few minutes, during which the evidence as to her condition was shown in connection with the testimony of Dr. Kaplan. In illustration of his testimony as to the condition of the plaintiff, the doctor was permitted to ask her certain questions to show her inability to speak or converse normally, and to request her to attempt certain motions *422 to demonstrate her inability or limitations in such respects. The matter was one in the sound judicial discretion of the trial judge, and no abuse of discretion in that regard was shown. See Florida Greyhound Lines v. Jones, Fla. 1952, 60 So.2d 396, 397.
There remains for our consideration the contention of excessiveness of the verdict. The size of this verdict was unusual, if not unprecedented, for such cases. However, it was the sum determined upon by the jury, and one which the experienced trial judge, on motion for new trial did not find to be such as to shock the judicial conscience, and which the judge was unwilling to disturb.
A party who assails the amount of a verdict as being excessive, has the burden of showing it is unsupported by the evidence, or that the jury was influenced by passion or prejudice. Breeding's Dania Drug Co. v. Runyon, 147 Fla. 123, 2 So.2d 376, 377; Florida Power & Light Co. v. Robinson, Fla. 1953, 68 So.2d 406, 415. A verdict which has been approved by the trial court as to amount should not be disturbed on appeal if it has a reasonable relation to the damages proven, in the absence of a showing that it imposes a hardship out of proportion to the injury suffered. Margaret Ann Super Markets, Inc. v. Scholl, 159 Fla. 748, 34 So.2d 238; Florida Power & Light Co. v. Robinson, supra.
In Sproule v. Nelson, Fla. 1955, 81 So.2d 478, 481, 76 A.L.R.2d 1066, the Supreme Court, speaking through the late Justice Glenn Terrell, said:
"There is an element of speculation in most personal injury verdicts, but this is a matter for jury discretion. The court may review their discretion but not the amount awarded unless shown to be clearly arbitrary. * * *"
The determination of the amount of such damages is peculiarly within the province of the jury. Higbee v. Dorigo, Fla. 1953, 66 So.2d 684; Merwin v. Kellems, Fla. 1955, 78 So.2d 865; Sproule v. Nelson, supra.
In Upton v. Hutchison, Fla. 1950, 46 So.2d 20, 21, the Supreme Court said: "It is well settled that the verdict of a jury will not be disturbed by this court on appeal where there is ample substantial evidence to support such verdict. Nor will this court substitute its judgment for that of the jury as to the amount of damages to which the plaintiff is entitled, unless the amount found is so excessive as to indicate that the jury was influenced by passion, prejudice, corruption, or other improper motive. Loftin v. Dagley, 152 Fla. 831, 13 So.2d 311; Florida Motor Lines Corp. v. Shontz, 159 Fla. 518, 32 So.2d 248." See also, Radiant Oil Co. v. Herring, 146 Fla. 154, 200 So. 376, 378; Rite Rate Cab Company v. McGee, Fla.App. 1964, 159 So.2d 663, 664.
The argument presented on this point by the appellants is that because of the size of this verdict it should be concluded its determination "was governed by sentimental or fanciful standards such as passion or sympathy," and therefore that a new trial should be ordered.
In a case such as this, upon finding the defendants (appellants) liable for plaintiff's injuries as disclosed at the trial, the jury was entitled to allow as damages the sum it determined was proper based on the evidence, for the elements of damage as given them in charge by the court, including the elements of past and future pain and suffering and loss of ability to enjoy and lead a normal life, taking into consideration the plaintiff's life expectancy and her need for continuing medical and nursing care for the remainder of her life, which is found from the evidence to have been made necessary by the nature and the permanency of her injuries. Cf. Kolesar v. United States, S.D.Fla. 1961, 198 F. Supp. 517.
At the time the plaintiff received her injuries in 1959, she was 35 years of age, married, and the mother of three children. She was rendered permanently disabled and bedridden, such as to require medical care *423 and nursing indefinitely. Her reasonable life expectancy from the time of the trial in 1967 was shown to be 35.2 years. Rather than to attempt a detailed statement of her disabilities and of the treatment and care she will need, we have set out in a footnote testimony by Dr. Kaplan dealing with those matters.[1]
*424 Other than for the size of the verdict, no matters are pointed to or disclosed in the record from which to find or assume that in arriving at the verdict the jury was improperly influenced by passion or prejudice. In view of the evidence relating to the injuries and damages, and taking into consideration the trial judge's approval of the verdict when asked to reject or reduce it on motion for new trial, we do not find the verdict to be such as to shock the judicial conscience or that because of the size of the verdict it should be held that it was not properly determined by the jury. In the situation presented, we are not required or inclined to grant a new trial merely in order to have the damages reassessed by another jury.
Affirmed.
NOTES
[1] "Q Now, Doctor, if you will explain to the jury the generalized condition of Mrs. Holl without her being here, sir. A Yes. I did not examine her completely today, except to confirm that she has essentially the same neurological disability which she had when I examined her on September 25, 1963, which is over three years ago.

"She has a speech disorder which we call perseveration or echolalia, that is, she repeats the words she is responding to. However, she is able to communicate, as you see. She is able to answer many questions, and she did when I examined her before, answer many questions.
"She was disoriented in time when I saw her in 1963, and apparently is still in terms of calling this 1965. When I saw her in 1963 she called it 1960 and thought it was December, not September. She also knew that she had three children but could not give their ages accurately, and she knew some current events but made many mistakes in current events, and of course I have not re-examined her with regard to this day.
"Her remote memory, when I tested it in 1963, was not bad. She could remember things in her background, although one had to be very patient to get a response, since each response would produce a long line of repetitive words, and which would gradually fade out, and she could not answer the next question until this would disappear.
"She had, when I saw her then, and still has, a shaking motion of her head back and forth and from side to side. This is an involuntary motion, a repetitious motion.
"She had impaired convergence of her eyeballs, that is, could not follow my finger, and the eyeballs would not normally converge on the finger in front of her.
"She did not have any abnormalities in the eyegrounds which I examined with the use of an ophthalmoscope. The eyegrounds seemed normal. There was also a normal excursion of the eyeballs. There were no paralysis of the eyeball muscles.
"Here speech was somewhat disarthic, that is, not clearly intelligible, as it is now. Perhaps it was somewhat worse when I saw her then. I can't judge, since it's a long period of time; and she had from the motor point of view almost a complete quadriplegia, that is, paralysis of all four extremities, as she does today, with motion best in the left lower extremity.
"She had fixation of both elbows, in flexion and across the chest, with the fingers flexed, pronated and deformed in terms of their relationship to each other.
"Her left leg could be extended when I saw her, but not completely, and it now seems to be more extensible than it was in 1963. The right leg was fixed in extension at that time and is still fixed in extension, with a spastic paralysis where the leg cannot be bent at the knee. The leg  or the foot rather, was inverted as it is today, with the foot turned inwards in a spastic condition, and she had what was described then and still has now, from simple observation, tonic Babinski toe sign. A Babinski sign is named after the man who described this. It is elicited by stroking the sole of the foot. The normal response to stroking the sole of the foot is a downward movement or a grasping movement of the toes.
"When certain brain and spinal cord pathways are involved, this response is replaced by an upward extension of the big toe and a fanning or partial flexion of the little toes. She has this position even without stimulation of the sole of the foot, in which case it is called a tonic or a constant Babinski sign rather than one elicited by stimulation.
"I could not elicit any reflexes and did not attempt to do so today, and she had total incontinence of bladder and bowels and was totally bedridden when I saw her, and apparently is still today incontinent, from what I understand, although I have not taken any history from her.
"So that the essence of her neurological disability is that this patient has extensive involvement of the central nervous system, with paralysis of both upper extremities in spastic flexion, paralysis of the right lower extremity in extension, some involvement of the left lower extremity, which is persistent, and disturbances in thinking and mentation and mood from excessive crying which is reported as well as repetitious speech, and some disorientation in time and her recent retention.
"This is an extensive involvement of the nervous system which makes her a total neurological disability, in my viewpoint.
"Q Doctor, I have to ask you a couple of obvious questions, but I have to have it for the record. Is this lady 100 per cent permanently and totally disabled? A Yes, sir. Q And is she going to need future medical attention? A Oh, yes. Q Will you tell us what this lady needs in the way of future medical attention? A Yes, This patient will need constant nursing attention and periodic medical attention in terms of physicians' care, but constant nursing attention in terms of maintaining her skin, her bladder, and her lung condition so that these do not become infected and lead to complications which can occur if proper care is not given.
"The complications that one wishes to avoid by good nursing care are the production of bedsores, which would occur because she is paralyzed, and unless she is turned and the skin properly taken care of, this would occur. Bladder infection is important. It must be noted that she has to be checked for this periodically, and she must be taken care of because she is incontinent, and therefore soils herself, and in doing so increases the chance of infection; and of course, she is immovable generally. She has to be turned frequently so she doesn't develop stasis or stagnant condition in her lungs and therefore become prey to a pulmonary infection or lung infection.
"With such proper care she should maintain her relative well-being from the purely medical point of view, not from the neurological point of view.
"Q All right now. You have used the word `incontinent,' and just so I have this explained, does she have any control over her bladder or going to the bathroom? A No, she has none. Q And the same way with bowel movements? A Yes, sir. Q She has no control? A No control. Q And, sir, as to this lady's general condition, other than her brain neurological paralysis, but as to her heart and her lungs and such things as that, what is the situation there? A Well, of course, I did not examine her heart and lungs specifically, but from my understanding of her examination and from my brief examination during the neurological examination, there is no involvement of her heart or lungs, or any of the vital organs, other than the nervous system. Q As to the future of this lady living into the future, are you familiar with mortality tables, sir? A Generally, yes. Q I mean what they are, not what they say. A Oh, sure. Q About life insurance companies, put out by them, as to how long a person is expected to live; is that right? A Yes, of course. Q With the type of nursing care that you have mentioned that this lady needs, and with the type of medical care that you feel that this lady will need, in your opinion, sir, what does the future hold for her as to her life expectancy? A In my opinion there would be no effect upon her longevity, given adequate and proper nursing and medical care."